## In re GUARDIANSHIP OF SANDERS.

[Cite as *In re Guardianship of Sanders* (1997), 118 Ohio App.3d 606.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 16056.

Decided March 7, 1997.

*Carol J. Holm,* for appellant.

*Patrick J. Mulligan,* for appellee.

WOLFF, Judge.

Amy Sanders Jump appeals from a judgment of the Montgomery County Common Pleas Court, Probate Division, which denied her application to terminate the guardianship of Elizabeth Leigh Sanders.

A brief statement of the facts and of the procedural history follows. The facts will be discussed in more detail under the assignments of error.

Mrs. Jump is the biological mother of Elizabeth Leigh Sanders, who was born on August 3, 1990. Mrs. Jump was not married when she gave birth to Elizabeth. From the time Elizabeth was born until late 1993, Mrs. Jump and Elizabeth lived with Mrs. Jump's parents, Barbara Gail and William Sanders, Sr. In the fall of 1993, Mrs. Jump and Mrs. Sanders agreed that Mrs. Sanders should be named Elizabeth's guardian. On November 1, Mrs. Sanders filed an "Application for Appointment of Guardian of Minor." According to the application, a guardian was necessary because "the best interests of the minor [would] be promoted thereby." The type of guardianship applied for was "non-limited," "person only." Thereafter, Mrs. Jump filed a "Waiver of Notice and Consent" to the appointment of Mrs. Sanders as Elizabeth's guardian and an affidavit stating that she had no knowledge as to the identity of Elizabeth's father.

On December 9, 1993, a hearing on the guardianship application was held. Mr. and Mrs. Sanders, Patrick Mulligan, the Sanderses' attorney, Mrs. Jump, and Richard Stone, a friend of Mrs. Jump, were present. Mrs. Jump was twenty-one years old at the time of the hearing. The probate court filed a judgment entry appointing Mrs. Sanders as Elizabeth's guardian the same day.

Mrs. Jump married Tyler Jump in October 1994. They have one child, Victoria, who was born in February 1995. In early to mid–1995, problems arose between Mrs. Jump and Mrs. Sanders with respect to Mrs. Jump's visitation with Elizabeth. As a result, on August 1, 1995, Mrs. Jump filed an application to terminate the guardianship, stating that termination of the guardianship would be in Elizabeth's best interests. The probate court held a hearing on the application on September 26 and October 11, 1995.

In a June 3, 1996 decision and entry, the court stated that there were no grounds pursuant to R.C. 2109.24 for the removal of Mrs. Sanders as Elizabeth's guardian and denied the application to terminate the guardianship. Mrs. Jump requested the court to issue findings of fact and conclusions of law, which it did on July 16. The court found, among other things, that Mrs. Jump had "specifically and voluntarily relinquished custody, control and guardianship of Elizabeth by agreeing to the appointment of Mrs. Sanders as Elizabeth's guardian," and that the harm that would be caused by termination of the guardianship and the attendant change in Elizabeth's custody greatly outweighed any possible advantages of such a change. The court reiterated its conclusion that no grounds existed under R.C. 2109.24 for removal of Mrs. Sanders as guardian, and also concluded that it was in Elizabeth's best interests to remain the ward of Mrs. Sanders, with Mrs. Jump enjoying reasonable and appropriate visitation.

Mrs. Jump advances five assignments of error on appeal. As the central issues in this appeal are embodied in Mrs. Jump's third and fourth assignments of error, we will address them first.

"III. The trial court erred to the prejudice of the appellant when it did not find that the interest of the trust (Elizabeth) demanded that the guardianship be terminated under O.R.C. § 2109.24.

"IV. The trial court erred to the prejudice of the appellant when it did not use its power to remove the guardianship for 'good cause' under O.R.C. § 2111.46."

Mrs. Jump contends that the trial court erred in not removing Mrs. Sanders as Elizabeth's guardian.

■ A guardian is a fiduciary, appointed by and accountable to the probate court. See R.C. 2109.01. With respect to the removal of a guardian, R.C. 2111.46 provides that "[w]hen a guardian has been appointed for a minor before such minor is over fourteen years of age, such guardian's power shall continue until the ward arrives at the age of majority, unless removed *for good cause* or unless such ward selects another suitable guardian." (Emphasis added.) "Good cause" is not defined within this section. However, the third paragraph of R.C. 2109.24, which addresses the removal of a fiduciary, states that "the court may remove any such fiduciary for habitual drunkenness, neglect of duty, incompetency, or fraudulent conduct, because the interest of the trust demands it, or for any other cause authorized by law." At least one court has found that R .C. 2109.24 "provides what constitutes good cause" under R.C. 2111.46. See *In re Conley* (1966), 10 Ohio Misc. 197, 39 O.O.2d 292, 224 N.E.2d 183.

Based on the wording of R.C. 2109.24, the statute appears to involve the removal of fiduciaries who have control over the estates or finances of another, including trustees. Here, Mrs. Sanders has guardianship of the person only, and not of the estate. As such, while the third paragraph of R.C. 2109.24 may be used to define the term "good cause" found in R.C. 2111.46, the statute does not appear to be an additional statute under which Mrs. Sanders can be removed as guardian in this case. Therefore, although Mrs. Jump argues that the trial court erred in not removing Mrs. Sanders as guardian pursuant to R.C. 2109.24 *and* 2111.46, we will treat her arguments that Mrs. Sanders should have been removed as guardian pursuant to R.C. 2109.24 as additional arguments that Mrs. Sanders should have been removed as guardian pursuant to R.C. 2111.46.

■ First, Mrs. Jump contends that the trial court erred in not finding that the interests of the trust, Elizabeth, demanded the removal of Mrs. Sanders as guardian. Specifically, Mrs. Jump argues that the probate court should have removed Mrs. Sanders as guardian because she had not permitted Mrs. Jump to

visit Elizabeth and "common sense would conclude that this visitation termination has been harmful to [Elizabeth]."

Mrs. Jump described five instances in which she claimed she wanted to see Elizabeth but Mrs. Sanders had either refused or impeded the visitation. On March 18, 1995, Mrs. Jump took Elizabeth to a nearby park with Mr. Sanders's permission. Shortly thereafter, Mrs. Sanders came and collected Elizabeth to go shopping. Mrs. Jump offered to come back later to spend time with Elizabeth, but Mrs. Sanders told her that they had already planned to see a movie. Mrs. Sanders agreed with this version of events and admitted that, although Mrs. Jump was welcome to visit Elizabeth at any time, Mrs. Jump had been inconvenienced on different occasions because she had made other plans for Elizabeth.

One week later, on March 25, Mrs. Jump and her husband went to visit Elizabeth but, according to Mrs. Jump, Mrs. Sanders would not open the door. Mrs. Sanders denied that she had not opened the door to Mrs. Jump. Approximately one month after that, Mrs. Sanders allegedly planned to attend her son's birthday party at a time when Mrs. Jump would not be there so that Mrs. Jump could not see Elizabeth. Mrs. Sanders denied this as well.

On April 21, Mrs. Jump was told she could not see Elizabeth. Mrs. Sanders conceded that she had refused to allow Mrs. Jump to visit Elizabeth that day, but stated that it was because Elizabeth had been exposed to scarlet fever at the day care center.

Finally, on Mother's Day, Mrs. Jump could not locate the Sanderses and therefore was unable to spend time with Elizabeth. Mrs. Jump had offered to make dinner and to bring it over to the Sanderses' house, but Mrs. Sanders had refused, apparently because Mr. Sanders was hospitalized for a blood clot. As it turned out, Mr. Sanders had been released from the hospital at noon on Mother's Day, and the Sanderses took Elizabeth out to dinner. According to Mrs. Sanders, she and her husband thought that because she had guardianship of Elizabeth, they did not have to "always * * * be home at every holiday."

Mrs. Jump asserts that the probate court should have been "deeply troubled" by Mrs. Sanders's refusal to allow her to see Elizabeth. We agree and observe that the record demonstrates that the court was troubled by the visitation problem. At the conclusion of Mrs. Sanders's testimony, the court addressed her as follows.

"The Court: Before we finish Mrs. Sanders, do you realize the mother has the right to see the child?

"Mrs. Sanders: Yes, sir.

"The Court: Why is it she can't see her daughter?

"Mrs. Sanders: Because there are problems, and the child is upset because Amy [Mrs. Jump] is telling her she wanted her to come live with her. Elizabeth said she didn't want to live at her house and didn't want to visit.

"The Court: Don't you think that calls for some sort of counseling in the best interest of your granddaughter * * *. We can't go on without having a mother see her daughter. You can't forget the fact that she is the mother. * * * Do we understand that?

"Mrs. Sanders: Yes, sir."

Moreover, at the close of all the evidence, the court stated that whether or not the guardianship was terminated, "there is no way this court will tolerate lack of visitation by the mother."

Undeniably, Mrs. Jump must be permitted to spend time with Elizabeth, and Elizabeth must be allowed to maintain a relationship with Mrs. Jump and her family. We disagree with Mrs. Jump, however, that removal of Mrs. Sanders as guardian is the only way in which this can be accomplished. Here, rather than remove Mrs. Sanders as guardian, the court ordered the parties to negotiate a visitation schedule for Elizabeth. Mrs. Sanders represents in her brief to this court that a fourteen-month visitation schedule, through December 1997, has been agreed to by the parties and filed with the probate court. Further, according to Mrs. Sanders, the visitation schedule gives Mrs. Jump approximately one hundred sixty visitation days with Elizabeth, including about ninety overnight visits.

The court-ordered visitation schedule, if followed, should resolve the visitation problem between the parties and will preserve Elizabeth's interests in maintaining a relationship with Mrs. Jump. Therefore, the probate court did not abuse its discretion in not removing Mrs. Sanders as guardian because of Mrs. Jump's contention that the interests of the trust, Elizabeth, demanded it.

■ Second, relying upon *In re Spriggs* (Apr. 24, 1990), Scioto App. No. 89–CA–1803, unreported, 1990 WL 54871, Mrs. Jump argues that the court should have removed Mrs. Sanders as guardian because Mrs. Sanders's appointment was not meant to be a permanent arrangement and Mrs. Jump was ready, willing, and able to resume custody of Elizabeth.

In addition to being an unreported case from the Fourth District Court of Appeals and thus not binding on this court, *Spriggs* is distinguishable from this case in at least one important respect. In *Spriggs,* Jill Spriggs Staggs and her daughter, Megan Nicole, moved in with Jill's great aunt, Jamianne Spriggs, shortly after Megan's birth. Approximately five years later, Jill moved from Ohio to New Jersey to start a new job. A guardianship was established for Megan with Jamianne being appointed guardian. Jill submitted a waiver of

notice and consented to the appointment. Seven months later, Jill filed an application to terminate the guardianship, which the probate court granted. Unlike this case, however, the probate court in *Spriggs* specifically found, based on Jill's testimony, that she had never intended to give up permanent custody of her daughter and that the guardianship was a temporary measure until Megan could move to New Jersey and join Jill or until Jill returned to Ohio. Because the evidence supported a finding that the relinquishment of custody was temporary only, the court of appeals affirmed the probate court's conclusion that Jill had not forfeited her rights to custody of Megan.

Whether a parent relinquishes rights to custody is a factual determination to be made by the trier of fact and should not be disturbed if supported by some reliable, credible evidence. *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 66, 22 OBR 81, 83–84, 488 N.E.2d 857, 860–861. Here, the trial court found that the guardianship was permanent, and that Mrs. Jump had specifically and voluntarily relinquished custody of Elizabeth by agreeing to the appointment of Mrs. Sanders.

Mrs. Jump challenges the trial court's finding on this issue. She argues that she understood the guardianship to be temporary only and that it would be terminated once she was married or otherwise able to provide for Elizabeth. Mrs. Jump also points to the testimony of Richard Stone, the friend who accompanied her to the December 9, 1993 hearing on the guardianship application, and William Sanders, Jr., her brother, both of whom testified that they were under the impression that the guardianship was temporary in nature. When the court questioned her regarding her recollection of the December 9, 1993 hearing, Mrs. Jump stated that she remembered the court telling Mrs. Sanders that as guardian she would have to make decisions based on Elizabeth's best interests. Mrs. Jump testified that she did not, however, remember the court informing her that the guardianship would be in effect until Elizabeth was eighteen years old unless there was a change of circumstances of the guardian.

Mrs. Sanders testified that when she agreed to be Elizabeth's guardian, she believed it to be a permanent arrangement. In particular, she remembered the court stating that "[t]his is a permanent guardianship until Elizabeth is 18 years old, and I don't want to see you back here in two years." Mr. Sanders's testimony was consistent with Mrs. Sanders's testimony. We also note that, according to the guardianship application, the guardianship was denominated as "non-limited," not "limited." If Mrs. Sanders had applied for a limited guardianship, she would have had to specify the term of the guardianship on the application. More important, Judge Gounaris, who had presided over the hearing on the application to appoint Mrs. Sanders as guardian, also presided over the hearing on the application to terminate the guardianship. Several times during

the latter proceedings, Judge Gounaris noted that he recalled explaining to Mrs. Sanders and Mrs. Jump that the guardianship was not temporary, that it was permanent, and that it would be in effect until Elizabeth was eighteen years old. Indeed, Judge Gounaris took judicial notice of the fact that he had so informed Mrs. Sanders and Mrs. Jump. Although the transcript of the December 9, 1993 hearing is not a part of the record before us, we have previously stated that a judge may properly rely on his own memory, among other factors, to clarify the record. See *State v. Beane* (Aug. 9, 1995), Champaign App. No. 95 CA 4, unreported, 1995 WL 472153.

While there was conflicting evidence presented with respect to whether the guardianship was intended by the parties to be permanent, and whether Mrs. Jump had, by agreeing to the guardianship, relinquished her rights to custody of Elizabeth, the trial court's findings on these issues were supported by competent evidence. Therefore, we will not disturb these findings.

■ Third, Mrs. Jump contends that the court should have removed Mrs. Sanders as guardian because Mrs. Jump has a paramount right to custody of Elizabeth.

■ Generally, in original custody awards and disputes between a parent and a nonparent, parents who are deemed suitable have a "paramount" right to the custody of their minor children as against a nonparent. *Masitto, supra*, 22 Ohio St.3d at 65, 22 OBR at 82–83, 488 N.E.2d at 859–860, citing *In re Perales* (1977), 52 Ohio St.2d 89, 97, 6 O.O.3d 293, 297, 369 N.E.2d 1047, 1051–1052. This right is not absolute, however, and can be forfeited by the biological parents. *Reynolds v. Goll* (1996), 75 Ohio St.3d 121, 123, 661 N.E.2d 1008, 1009–1010. Parents who have relinquished custody through contract or abandonment, or who are totally unable to care for their children, may be found to have forfeited their paramount right to custody. *Id.*, citing *Perales, supra*, at 98, 6 O.O.3d at 297–298, 369 N.E.2d at 1052. Thereafter, they must meet the standards of the "best interests of the child" test when attempting to change custody. *Masitto, supra*, at 66, 22 OBR at 83–84, 488 N.E.2d at 861.

Here, Mrs. Sanders was appointed guardian of Elizabeth, a minor, because the court found that Elizabeth's interests would be promoted by the guardianship. See R.C. 2111.06, which also provides that "[a] guardian of the person shall have the custody and provide for the maintenance of the ward, and if the ward is a minor, such guardian shall also provide for the education of such ward." Thus, by virtue of her appointment as Elizabeth's guardian, Mrs. Sanders was given custody of Elizabeth. If Mrs. Sanders were removed as guardian, custody of Elizabeth would necessarily change because Mrs. Sanders would no longer have a right to the custody of Elizabeth. Therefore, the issues of termination of the

guardianship and custody in this case are "inextricably intertwined." See *In re Guardianship of Wonderly* (1981), 67 Ohio St.2d 178, 183, 21 O.O.3d 111, 115, 423 N.E.2d 420, 424.

Mrs. Jump relies on our decision in *In re Custody of Carpenter* (1987), 41 Ohio App.3d 182, 534 N.E.2d 1216, to support the proposition that she has a paramount right to custody of Elizabeth. In *Carpenter*, maternal grandparents were given custody of their grandchild as a result of a judgment entry to which both the child's mother and father agreed in October 1985. Thereafter, in August 1986, the father moved to terminate the grandparents' custody. At the hearing on the father's motion, the trial court applied the best-interests-of-the-child standard, found that the statutory criteria had not been met, and denied the father's application.

We reversed the trial court's decision because we concluded that the trial court had erred in applying the best-interests-of-the-child standard to a case in which temporary custody only had been awarded to the grandparents. *Carpenter, supra,* at 185, 534 N.E.2d at 1218–1219. We noted that the judgment entry characterized the grant of legal custody as temporary. Moreover, both parents testified at the hearing on the application to terminate the guardianship that, at the time they executed their consents, they understood that only a temporary award of custody was involved. The grandparents also testified that they thought the custody awarded to them was temporary only. We held that an agreement to surrender temporary custody was not a relinquishment of the parent's natural right to preferential treatment in a subsequent determination of custody and remanded the case for determination of whether the father was "suitable" and thus entitled to custody. *Id.* at 185–186, 534 N.E.2d at 1218–1220.

*Carpenter* is distinguishable from this case because, like Spriggs, it involved a *temporary* grant of custody. As we discussed above, the probate court's findings that the guardianship was permanent in nature and that, by agreeing to it, Mrs. Jump had voluntarily relinquished her rights to custody of Elizabeth, were supported by competent, credible evidence. Therefore, unlike the father in *Carpenter*, Mrs. Jump surrendered her paramount right as a natural parent to preferential consideration in a subsequent custody determination. *Masitto, supra,* 22 Ohio St.3d at 66, 22 OBR at 83–84, 488 N.E.2d at 860–861. Therefore, on her application to terminate the guardianship, which would, in effect, result in a change of Elizabeth's custody, Mrs. Jump was required to show that a change had occurred in either Elizabeth's or Mrs. Sanders's circumstances and that a modification was necessary to serve Elizabeth's best interests. See R.C. 3109.04(E)(1)(a); *Carpenter, supra,* 41 Ohio App.3d at 185, 534 N.E.2d at 1218–1219.

The trial court found that there had been no change in Mrs. Sanders's circumstances since she was appointed Elizabeth's guardian that negatively affected her willingness or ability to act as Elizabeth's guardian. Mrs. Jump argues that there has been a change in Mrs. Sanders's circumstances, as evidenced by her preventing Mrs. Jump from seeing Elizabeth, and by her instructing Elizabeth to call her "mommy" and Mrs. Jump "Amy."

As we discussed above, the court-ordered visitation schedule, if followed, should resolve the parties' visitation problems and will preserve Elizabeth's interest in maintaining a relationship with Mrs. Jump. Additionally, Mrs. Sanders emphatically denied that she had instructed Elizabeth to refer to her as "mommy" and to Mrs. Jump as "Amy." Rather, Mrs. Sanders testified that Elizabeth calls her "Mimi," as do all of her other grandchildren.

With respect to Elizabeth's best interests, the trial court found that (1) Elizabeth had lived with the Sanderses continuously since her birth; (2) the Sanderses had been Elizabeth's primary caregivers for her entire life; (3) Elizabeth was completely integrated into the Sanderses' household; (4) the Sanderses had provided Elizabeth with tender, loving care and had, in general, done all that loving parents or guardians could do for a child; and (5) the harm that would be caused by termination of the guardianship and the attendant change in Elizabeth's custody greatly outweighed any possible advantages of such a change at that time. Accordingly, the trial court concluded that it was in Elizabeth's best interests to remain the ward of Mrs. Sanders, with Mrs. Jump enjoying reasonable and appropriate visitation.

■ Mrs. Jump challenges several of the trial court's factual findings. In reviewing these challenges, we are mindful that an appellate court must be guided by a presumption that the findings of the trier of fact are correct. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410–411, 461 N.E.2d 1273, 1276. The deference accorded the trial court is based on the trier of fact's ability "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* "The knowledge a trial court gains through observing the witnesses cannot be conveyed to a reviewing court by a printed record." *Reynolds, supra,* 75 Ohio St.3d at 124, 661 N.E.2d at 1010, citing *Trickey v. Trickey* (1952), 158 Ohio St. 9, 13, 47 O.O. 481, 483, 106 N.E.2d 772, 774.

■ First, Mrs. Jump takes issue with the court's finding that Mr. and Mrs. Sanders have been Elizabeth's primary caregivers for her entire life. Mrs. Jump argues that she lived with Elizabeth in the Sanderses' home until late 1993 and that there were several adults involved in Elizabeth's care other than Mr. and Mrs. Sanders.

Mrs. Sanders testified that during the time Mrs. Jump lived with them, Mrs. Jump worked until late at night and sometimes would not come home until 6 a.m. Additionally, both Mr. and Mrs. Sanders testified that Mrs. Jump was frequently away from home. As a result, Mrs. Sanders got Elizabeth ready for school, took her to school, and then either she or her husband collected Elizabeth after school. According to Mrs. Sanders, she also made Elizabeth's dinner and spent time playing with her in the evenings before putting her to bed. Mrs. Jump does not direct our attention to any evidence which contradicts this testimony, and we note that the fact that the Sanderses may have been among a group of people who provided care for Elizabeth does not necessarily mean that they were not Elizabeth's primary caregivers. Based on the evidence presented, the trial court could have reasonably concluded that Mr. and Mrs. Sanders had been Elizabeth's primary caregivers since her birth.

██ Second, Mrs. Jump claims that the trial court erred in finding that Elizabeth was completely integrated into the Sanderses' household and that the Sanderses had provided Elizabeth with tender, loving care and had, in general, done all that loving parents or guardians could do for a child.

Elizabeth has lived with the Sanderses since her birth in August 1990. The evidence in the record demonstrates that Elizabeth is enrolled in the Lutheran School of Dayton and attends church regularly, including Sunday school. The Sanderses introduced into evidence a letter from Gerald Haun, the principal of Elizabeth's school, which indicates that Elizabeth is well adjusted, well liked by her classmates, and progressing satisfactorily in her classes. Further, the Sanderses have taken Elizabeth on trips to Baltimore, Disney World, Indianapolis, Niagara Falls and Toronto, Canada. Moreover, two of the Sanderses' neighbors testified that Elizabeth always appeared to be happy and well cared for by the Sanderses. This evidence amply supports the trial court's findings that Elizabeth was integrated into the Sanderses' household and that the Sanderses generally had done all that loving guardians could do for a child.

██ Next, Mrs. Jump challenges the trial court's finding that the harm that would be caused by termination of the guardianship and the attendant change in Elizabeth's custody greatly outweighed any possible advantages of such a change. Upon Mrs. Jump's request, the court ordered psychological evaluations of Mrs. Jump and her husband, Mr. and Mrs. Sanders, and Elizabeth. Dr. Phyllis Kuehnl conducted the evaluations for the court. As a part of her summary and recommendation, Dr. Kuehnl stated:

"[A]s long as [Elizabeth] has contact with both families and the family members cease in imposing their needs upon [her], she should develop just fine. This examiner is not the trier of fact, therefore, the Court needs to determine

which family unit is more likely to foster a positive relationship between this child and the other significant adults in her life. * * * [I]f the Court perceives the Sanders have attempted to alienate [Elizabeth] from [Mrs. Jump] by denying access to maintain control, [Elizabeth] should be returned to the custody of [Mrs. Jump]."

Mrs. Jump argues that Dr. Kuehnl did not find that Elizabeth would be harmed by a change in custody and that the trial court did not accord enough weight to Dr. Kuehnl's evaluation and recommendation.

Initially, we observe that the psychological evaluations were ordered to aid the court in making its decision and not to compel what its decision should be. As Dr. Kuehnl aptly pointed out, the trial court is the finder of fact and must ultimately determine whether a change of custody is in Elizabeth's best interests. The trial court was troubled by the parties' visitation problems but, again, the court-ordered visitation should resolve those problems. Moreover, we have concluded that the court's findings that the Sanderses had been Elizabeth's primary caregivers since birth and that Elizabeth was completely integrated into the Sanderses' household were supported by the evidence. Based on these findings, as well as all the other facts and circumstances here, the trial court could have reasonably concluded that more harm than good would come from a change in Elizabeth's custody at this time.

Without elaboration, Mrs. Jump has submitted an unreported case from the Ninth Appellate District, *In re Guardianship of Warner* (Sept. 2, 1987), Medina App. No. 1600, unreported, 1987 WL 16650, as supplemental authority to her brief. In *Warner*, Darlene Mariner was the natural parent of Brandon. In 1982, Darlene's mother was appointed as Brandon's guardian. Thereafter, in 1986, Darlene filed a motion to terminate the guardianship. Finding that it was in Brandon's best interests to do so, the trial court terminated the guardianship. The court of appeals found that the trial court had not abused its discretion in terminating the guardianship and affirmed. The facts given in the opinion are too minimal for us to determine if they are analogous to the facts of this case. The determination as to what is in a child's best interests is a fact-sensitive determination. Without being able to compare the facts of *Warner* to this case, we can only observe that, unlike the trial court in *Warner*, the trial court here determined that it would be in the child's best interests for the guardianship to continue, and that determination is supported by the record.

Based on the foregoing, the trial court was well within its discretion when it concluded that no grounds existed upon which to remove Mrs. Sanders for "good cause" pursuant to R.C. 2111.46 and that it was in Elizabeth's best interests to remain under the guardianship of Mrs. Sanders, with Mrs. Jump enjoying reasonable and appropriate visitation.

■ Finally, relying on *Marich v. Knox Cty. Dept. Of Human Serv.* (1989), 45 Ohio St.3d 163, 543 N.E.2d 776, Mrs. Jump contends that her consent to the guardianship should be voided because it was obtained by undue influence.

*Marich,* unlike this case, involved an agreement to permanently surrender a child for adoption. In *Marich,* Melissa Marich, a fifteen-year-old single mother, was visited by a representative of the Knox County Department of Human Services immediately after her child was born. The representative allegedly told Marich that the natural father would have to be notified if the child was not surrendered for adoption. Marich was afraid of the child's father, who at the time was serving a prison sentence. Marich was persuaded to sign the permanent surrender agreement. Only one-half hour after she signed the agreement, the representative brought her before a judge who approved the surrender. The signature and approval occurred on a Friday. By the next Monday, Marich had consulted with a lawyer to have the agreement revoked.

The Supreme Court defined "undue influence" as "urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely." *Marich, supra,* at 166, 543 N.E.2d at 780, citing Black's Law Dictionary (5 Ed.1979) 1370. The court concluded that based on the representative's conduct and Marich's age, marital status, health, mental and emotional condition, and her almost fiduciary trust in the representative, the representative had exerted undue influence upon Marich to surrender her child. Because Marich's consent to the permanent surrender agreement was obtained by undue influence, the agreement was invalid. *Id.* at 167, 543 N.E.2d at 780–781.

Mrs. Jump argues that Mrs. Sanders "induced" her to agree to the guardianship based on the opportunity for Elizabeth to have insurance coverage. Although it is undisputed that one of the purposes of the guardianship was to enable Elizabeth to be covered by Mrs. Sanders's health insurance, Mrs. Jump has not directed us to any evidence in the record that she consented to the guardianship against her will. The evidence demonstrates that Mrs. Sanders and Mrs. Jump discussed the possibility of a guardianship for Elizabeth in the fall of 1993. Mrs. Sanders filed an application for appointment as guardian and Mrs. Jump filed a waiver of notice and consented to the guardianship in November. The hearing on the application, however, was not held until one month later, on December 9. Mrs. Jump, who had given birth to Elizabeth more than three years earlier, was twenty-one years old at the time of the hearing and has presented no evidence that she was under any type of mental, physical, or emotional strain. Mrs. Jump's bare assertion that her consent to the guardianship was obtained as the result of undue influence, without more, is insufficient to conclude that she had consented to the guardianship against her will.

Accordingly, the third and fourth assignments of error are overruled.

"I. The trial court erred to the prejudice of the appellant when it made findings of fact not in accordance with the testimony.

"II. The trial court erred to the prejudice of the appellant when it did not find a change of circumstance of the guardian."

Under these assignments of error, Mrs. Jump contends that several of the trial court's factual findings were not supported by the evidence. We have already addressed and rejected each of her contentions in our analysis under the third and fourth assignments of error, *supra.*

Therefore, the first and second assignment of errors are overruled.

"V. The trial court erred to the prejudice of the appellant when it did not use its power in law and equity to dispose fully of this case's issues."

Despite the wording of this assignment of error, Mrs. Jump does not contend that the trial court failed to dispose of all the issues in this case. Rather, Mrs. Jump merely reiterates her earlier arguments that the trial court should have (1) terminated the guardianship for good cause pursuant to R.C. 2111.46, (2) found that Mrs. Jump did not understand the guardianship to be of a permanent nature and thus did not relinquish her rights to custody of Elizabeth, and (3) found that Mrs. Jump had a paramount right to the custody of Elizabeth. Because we have already addressed and rejected these contentions in our discussion of the third and fourth assignments of error, *supra,* this assignment of error is overruled.

The judgment of the trial court will be affirmed.

██ Mrs. Jump filed a motion to supplement her brief after oral arguments were held. Mrs. Sanders argues that we should overrule Mrs. Jump's motion to supplement her brief because she did not provide copies of the supplemental authority to us or to Mrs. Sanders until after oral arguments were held, in violation of App.R. 21(H). While Mrs. Jump did not comply with the mandates of App.R. 21(H), we have decided, in our discretion, to consider the supplemental authority. Accordingly, we will overrule the motion to strike Mrs. Jump's supplemental authority.

*Judgment accordingly.*

BROGAN, J., concurs.

GRADY, J., concurs.

GRADY, Judge, concurring.

I agree that Amy Jump has failed to demonstrate that the probate court abused its discretion when it denied her R.C. 2111.46 application to terminate her daughter's guardianship. That section requires proof that the guardian is unqualified to have continued charge of the "custody and tuition" of the ward that she was awarded pursuant to R.C. 2111.07. The evidence that Amy Jump offered fails to demonstrate lack of qualification, though it does suggest that the guardian has been insensitive to the needs of the child and her mother to see each other. The visitation schedule ordered by the probate court reasonably attempts to cure that problem.

The more fundamental issue is whether this guardianship should be terminated because the reasons for which it was created no longer exist. There seems to be no real dispute that it was created in order to obtain health and medical insurance coverage for Elizabeth, not because Amy Jump was unfit to fulfill her role as Elizabeth's mother. When the guardianship was created, Amy Jump did not have the benefit of her own counsel, but was required to rely on the attorney retained by her mother, the prospective guardian. Her own counsel might have advised Amy Jump that a "limited guardianship" permitted by R.C. 2111.02(B) would be more appropriate because it could be limited in scope and duration and could preserve her rights as Elizabeth's mother in all other respects.

Civ.R. 60(B) permits a court to vacate its own prior orders for reasons that are equitable in nature. Paragraph (4) of the rule allows a court to do that when "it is no longer equitable that the judgment should have prospective application." Now that Amy Jump has health and medical insurance coverage available for Elizabeth, and absent any evidence that termination of the guardianship would be harmful to Elizabeth, that standard would seem to apply. Certainly, it seems inequitable to deny Elizabeth the consolation of a life with her own mother merely because as a young woman her mother foolishly acquiesced to creating a permanent guardianship.

It might be argued that a Civ.R. 60(B)(4) motion to vacate the guardianship on these grounds is barred by the doctrine of *res judicata* because the prior R.C. 2111.46 application to terminate the guardianship was predicated on the same grounds. However, the legal standards of the two motions, while broad and overlapping, are different. It would seem reasonable to refile this matter as a Civ.R. 60(B)(4) motion to vacate, particularly in view of this probate court's reputation for human insight. In that event, appointment of a guardian *ad litem* to represent Elizabeth's interests in the proceeding seems warranted.