OPINION
{¶ 1} Appellant Monica Dillon ("mother") appeals the May 3, 2005 Judgment Entry entered by the Holmes County Court of Common Pleas, Probate and Juvenile Division, which granted mother's request to establish visitation, but denied her motion to terminate the guardianship. Appellees are Douglas A. Smith and Juanita E. Smith ("grandfather", "grandmother", respectively, and "grandparents", collectively).
 STATEMENT OF THE FACTS AND CASE {¶ 2} Mother is the biological mother of Brenden Michael — Allen Dillon, who was born on July 17, 2000. Brenden's father is Aaron Lee Pennell, who is the stepson of grandfather and the son of grandmother. Beyond attending the February 18, 2003 hearing during which guardianship was established, Pennell has had little involvement in Brenden's life.
 {¶ 3} When Brenden was approximately five months old, grandparents began to assist mother with the child's care. The parties engaged in this mutual arrangement for approximately one year, during which mother would ask grandparents to watch the child and grandparents would ask mother to spend time with the boy. When Brenden was approximately two and a half years old, grandparents filed an Application for Appointment of Guardian of Minor pursuant to R.C. 2111.03 (C).
 {¶ 4} The trial court conducted a hearing on the application on February 18, 2003. Mother appeared without counsel, and the trial court advised her of her right to hire an attorney. Mother waived her right to counsel.[1] Via Judgment Entry filed February 19, 2003, the trial court granted grandparents' application to be appointed co-guardians of Brenden. Pursuant to the application, the guardianship was for a definite period of time until July 17, 2018. In the February 19, 2003 Judgment Entry, the trial court stated it explained to mother the affect of the guardianship and the authority the guardians would have thereunder. Mother advised the trial court she understood grandparents would have control of Brenden's physical care, medical and school issues, and her visitation with Brenden.
 {¶ 5} On December 18, 2003, mother filed a Petition to Establish Visitation, alleging she was not being allowed to visit Brenden on a regular basis. After mother failed to appear for a pretrial hearing on her petition, the trial court dismissed said application via Judgment Entry filed February 17, 2004. Mother filed a Motion to Terminate Guardianship and to Establish Visitation Rights on July 7, 2004. The trial court conducted a hearing on the motion on October 22, 2004, and November 3, 2004. At the hearing, mother presented testimony of friends and coworkers to establish the causes which led to the filing of the application of guardianship no longer exist, mother was in a position to care for Brenden, and the guardianship was no longer necessary.
 {¶ 6} Amanda Gooding, who has been friends with mother for a year and a half, testified mother's apartment was "always clean" and "usually picked up and pretty nice". October 22, 2004 Tr. at 10. Gooding stated she had never seen anything about mother or her environment which would give her cause for concern for the wellbeing of Brenden. Tammy Ridenbaugh, mother's immediate supervisor at East of Chicago Pizza, testified mother has worked for her for approximately two months. Ridenbaugh stated mother appears for work on time, in proper attire, and performs her duties as expected. Ridenbaugh explained mother works approximately twenty to twenty-five hours per week, and earns six dollars per hour unless she is serving, when she earns two dollars and thirty-five cents per hour plus tips.
 {¶ 7} Barb Heflin, the mother of mother's paramour, testified she has been acquainted with mother since November, 2002. Although Heflin could not recall the year she saw mother and Brenden together, she noted, when mother and son were together, mother took appropriate care of him. Heflin conceded mother's home "at times shows like people live there", but noted mother takes care of it. October 22, 2004, Tr. at 30. Heflin added there was nothing about the environment of the home or its condition which gave her cause for concern for Brenden. Heflin stated she visits mother's home a few times a month. Heflin and her husband do not provide any financial support to mother's household, and Heflin does not assist mother with any housecleaning.
 {¶ 8} Jeremy Heflin testified he and mother have lived together for almost two years. Jeremy stated he and mother have a one year old daughter together. Jeremy testified he and mother make sure everything in the apartment is child proof and clean, and noted mother is good about taking care of the home. Jeremy recalled he last saw mother with Brenden approximately one year prior to the hearing. Jeremy remembered Brenden was always happy around mother and one could see the child loves her.
 {¶ 9} Mother testified on her own behalf. She explained when she signed the document consenting to the guardianship of Brenden, she was not aware the child would be taken away from her home. Mother believed the guardianship allowed grandmother to care for Brenden for a short period of time if something happened to mother, but grandmother would return the boy to mother when she was able to care for her son. Mother testified grandparents have not permitted her to see Brenden in over a year. Mother declared she is financially and emotionally prepared to parent Brenden. On cross-examination, mother explained she had missed one Sunday visit with her son since the trial court established a visitation schedule as a result of a mix up regarding her work schedule. Mother acknowledged grandparents treated her well during her visits with Brenden and allowed her privacy during those times. Mother related her employment history and living arrangements prior to grandparents' receiving guardianship of Brenden. Mother has a valid driver's license and an insured automobile. Mother does not have a land phone, but purchases cellular phone minutes. Mother acknowledged she usually has used up all of the minutes four or five days before she gets paid. Mother conceded she has not always been able to buy Brenden Christmas or birthday presents due to her employment status.
 {¶ 10} The trial court extensively questioned mother. When asked about the voluntary case plan she signed with Children's Services, mother explained she did not attend parenting classes because she did not feel she needed them. The trial court asked mother to explain why she told the court she understood the effect of the guardianship at the February, 2003 hearing, but currently claims she did not understand what the guardianship was about. Mother explained, prior to the guardianship hearing, grandmother told her she ("grandmother") was not trying to take Brenden away from her ("mother"). Mother believed the relationship to be more like shared parenting. Mother stated she appreciated the role grandparents have played in Brenden's life.
 {¶ 11} At the close of mother's case, grandparents asked the trial court to deny mother's request to terminate the guardianship. The trial court overruled their request. Grandparents called Julie Kolacki as their first witness. Kolacki lived in a neighboring apartment to mother from August, 1999, to February, 2002. Kolacki recalled when Brenden was approximately six months old, she heard him crying for an extended period of time. Kolacki entered mother's apartment and found the child alone. Kolacki took the child to her apartment where she fed and changed him until mother picked him up. Kolacki recalled the child was left alone an average of two to three times a week. Kolacki testified she occasionally babysat Brenden at mother's request. On at least two occasions, mother did not pick up the child at the stated time, but came some six to eight hours late. Kolacki explained she never notified Children's Services about the situation because she feared retribution. Kolacki acknowledged she has not had any contact with mother since February, 2002, when mother and Brenden moved out of the building and has no knowledge of mother's current living conditions.
 {¶ 12} Another former neighbor of mother, Jennifer Troyer, testified she was outside doing yardwork when she saw Brenden in a second floor window, banging on the mini blinds. Troyer had seen Rhonda, Brenden's maternal grandmother, leave for work earlier in the day. Troyer assumed mother was in the apartment with the child, however, after several minutes, Troyer observed mother approximately two blocks from the apartment building. Although Troyer knew there were other occasions when Brenden was home alone, she never contacted Children's Services or the police.
 {¶ 13} Kathy Cronebach, a preschool teacher at Loudenville Headstart, testified she has been Brenden's teacher for two school years. Cronebach stated grandparents were active participants in the school activities, attending parent meetings and volunteering for parties. Cronebach stated Brenden does well in school and plays well with the other children.
 {¶ 14} Dawn Bucklew testified she resided on the same street as mother and Brenden in 2001. Bucklew knew mother since highschool as mother was friends with Bucklew's younger sister. Bucklew recalled mother smoked cigarettes and drank alcohol during her pregnancy. Bucklew provided extensive testimony regarding mother's inadequate parenting skills during the first year of Brenden's life.
 {¶ 15} Crystal Drockton, grandmother's daughter and Brenden's aunt, testified she first met the child when he was approximately five months old. Following the initial visit with Brenden, the child began to spend more and more time with grandparents. Drockton recalled Brenden, his clothing, and his belongings were dirty when he arrived for visits. Drockton's testimony focused on incidents which occurred prior to grandparents' receiving guardianship. Drockton also noticed the smell of marijuana at mother's current residence.
 {¶ 16} Grandmother testified her son, Aaron Pennell, is Brenden's father. She recalled the family first met Brenden at Thanksgiving, 2000, when the boy was five months old. Shortly thereafter, Pennell, who was nineteen years old, moved out of grandmother's home. Grandmother stated Pennell has not played much of a role in Brenden's life, and she does not have much contact with her son or knowledge as to his whereabouts and his employment status. Over objections of mother's counsel, counsel for grandparents elicited testimony relative to the conditions to mother's home and the child's environment prior to the establishment of the guardianship. Prior to the establishment of the guardianship, Brenden was with grandparents for 249 days during a one year time period. Grandmother explained this happened because Brenden would be staying with them for a day or two, and mother would call and ask grandparents to keep him for additional days, which ultimately turned into a week or weeks at a time. Following the establishment of the guardianship, mother was permitted to visit Brenden. Grandmother recalled mother's failure to visit the child on Mother's Day, 2003, calling approximately three and a half hours after the scheduled visit time. Grandmother also testified, after one overnight visit with mother, Brenden came home with large insect bites on his knee and flea bites on his ankles. When asked about the bites, mother told grandmother she had a bad flea problem due to her cat. Grandmother stated Brenden's person and clothing were often dirty when mother returned him from visits. Grandmother indicated Brenden does not have any developmental delays or mental health problems. Grandmother added mother has never given Brenden birthday or Christmas presents. Grandmother conceded she has no knowledge of mother's current circumstances.
 {¶ 17} Following the presentation of evidence, the trial court ordered the parties to prepare written final arguments. Via Judgment Entry filed May 3, 2005, the trial court denied mother's request to terminate the guardianship, but granted her request to establish visitation.
 {¶ 18} It is from this judgment entry mother appeals, raising the following assignments of error:
 {¶ 19} "I. THE COURT ABUSED ITS DISCRETION AND COMMITTED ERROR AT LAW WHEN FAILING TO TERMINATE THE GUARDIANSHIP OF A MINOR BY HOLDING THAT THE PARENT SURRENDERS HER RIGHT TO REAR HER CHILD BY CONSENTING TO THE GUARDIANSHIP.
 {¶ 20} "II. THE FAILURE TO TERMINATE THE GUARDIANSHIP OF BRENDEN DILLON UPON THE MOTION OF HIS MOTHER WITHOUT A FINDING OF HER UNSUITABILITY SUPPORTED BY SOME COMPETENT, CREDIBLE EVIDENCE VIOLATED HER CONSTITUTIONAL RIGHT TO REAR HER CHILD.
 {¶ 21} "III. THE TRIAL COURT ABUSED ITS DISCRETION WHEN DETERMINING THAT MONICA RELINQUISHED HER RIGHT TO REAR HER CHILD.
 {¶ 22} "IV. THE JUDGMENT OF THE TRIAL COURT OVERRULING MONICA'S MOTION TO TERMINATE THE GUARDIANSHIP IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I, II, III, IV {¶ 23} Because mother's assignments of error require similar analysis, we shall address said assignments together. In her first assignment of error, mother maintains the trial court abused its discretion and erred in failing to terminate the guardianship upon a finding mother had surrendered her right to rear Brenden by consenting to the guardianship. In her second assignment of error, mother asserts the trial court's failure to terminate the guardianship without finding mother unsuitable violated her Constitutional Right to raise her child. In her third assignment of error, mother asserts the trial court abused its discretion in determining she had relinquished her right to raise her child. In her final assignment of error, mother challenges the trial court's ruling as against the manifest weight of the evidence.
 {¶ 24} The trial court sub judice found the Second District Court of Appeals decision In Re: Guardianship of Sanders
(1997), 118 Ohio App.3d 606, to be persuasive and adopted the same. We find likewise. In Sanders, the Montgomery County Court of Appeals reviewed a trial court's denial of a mother's application to terminate the guardianship of her minor daughter. In November, 1993, the maternal grandparents of the child, Elizabeth, filed an Application for Appointment of Guardian of Minor, seeking a non-limited, person only guardianship. The mother filed a waiver of notice and consent, and the trial court subsequently filed a judgment entry appointing the maternal grandmother as Elizabeth's guardian on December 9, 1993. As a result of visitation problems between the mother and the maternal grandmother, the mother filed an application to terminate the guardianship. The probate court denied the application and the mother appealed.
 {¶ 25} The Second District Court of Appeals affirmed the probate court's decision, holding the best interest of the child test was appropriately applied because the case involved a change in permanent custody. Id at 615. The Sanders Court held the "good cause" standard for removing a guardian set forth in R.C.2111.46 encompasses the best interest of the child standard described in R.C. 3109.04 when the guardianship affects a permanent transfer of custody. Id at 618. The Court further held whether a guardianship was meant to affect a permanent change of custody is primarily a factual question for the trier of fact to resolve. Id at 613. The Montgomery Court of Appeals found the trial court did not abuse its discretion in finding the guardianship was meant to be a permanent change of custody and it would not be in the child's best interest to terminate the guardianship. Id at 618.
 {¶ 26} We find the trial court properly found the guardianship was permanent, and mother forfeited her right to custody of Brenden when she consented to the initial establishment of the guardianship. Despite mother's testimony to the contrary, the trial court's entry filed February 19, 2003, unequivocally establishes the trial court fully explained the affect of the guardianship to mother. The clear language of the guardianship application showed the grandparents sought guardianship until July 17, 2018, when Brenden turned eighteen years old. Because mother voluntarily gave up her right to custody, she must now satisfy the two part test set forth inSanders. We do not find the trial court abused its discretion in finding mother has failed to show a change in circumstances of the child or the grandparents.
 {¶ 27} Assuming arguendo, mother is able to satisfy the first prong of the Sanders test, the trial court did not abuse its discretion in finding mother failed to prove a change of custody would be in Brenden's best interest. Based upon the evidence presented at the hearing, which is set forth supra, we find mother failed to show the benefits of the termination of the guardianship would outweigh the harm caused to the child.
 {¶ 28} Mother's first, second, third, and forth assignments of error are overruled.
 {¶ 29} The Judgment of the Holmes County Court of Common Pleas is affirmed.
Hoffman, J. and Wise, P.J. concur, Edwards, J. concurs separately.
[1] Aaron Pennell's, Brenden's father, agreed to the application for guardianship and did not want to be represented by counsel.