JOURNAL ENTRY AND OPINION
{¶ 1} Plaintiffs-appellants, Robert DeCarlo and Frank Hanzel, appeal the trial court's decision to dismiss their petition for a civil protection order against defendant-appellee, Christopher Schilla, pursuant to R.C. 2903.214.
{¶ 2} In the petition, DeCarlo sought protection on behalf of himself, his wife Sharon, and his two daughters, Sarah and Samantha, aged 11 and 9, respectively. Hanzel's petition was filed on behalf of himself and his fiancee, Tammy Busch, and their eight-month-old son, Frank. Seeking a civil protection order, appellants argue that over a course of several years, Schilla had engaged in a course of conduct which led them to believe he intended to cause them and their families physical harm. Upon the filing of their petition, the court granted an ex parte civil protection order with the evidentiary hearing to be held at a later date. The ex parte order required appellee to stay away from appellants and to discontinue his behavior.
{¶ 3} At the hearing, there was no jury and all issues were tried to the bench. The evidence established that appellants and appellee all reside on Aldeene Avenue, Cleveland, Ohio. Appellants presented testimony from various witnesses who described appellee's conduct as menacing and threatening. According to Sharon DeCarlo, the first instance with appellee occurred shortly after the DeCarlo family moved into the neighborhood. On May 2, 1999, Sharon DeCarlo was washing her car when she saw appellee standing at the end of her driveway staring at her. Frightened, Sharon DeCarlo got her husband, who had been in the backyard. By the time Robert DeCarlo came to the front, appellee had walked across the street, onto his own property. Robert DeCarlo went over there to ask him if there was something he could do for him and [Schilla] picked up a broomstick out of his garbage and, my husband was in the street the whole time and started swinging at him. Tr. at 7. Robert DeCarlo confirmed his wife's version of the events. Tr. at 23-25. Sharon DeCarlo stated:
 {¶ 4} We were walking back from Marc's to our house, through the parking lot. And, he was clearly following us because there weren't any cars parked back where we were walking. And when we got to the gate, he turned around and drove away.
{¶ 5} Tr. at 8.
{¶ 6} When asked what behavior by appellee made her believe he would cause her physical harm, she stated [h]is erratic and irrational behavior, it scares me. Tr. at 9. She testified that she is afraid that one day he may do something physically harming. Tr. at 9. Sharon DeCarlo stated that appellee stares and has followed her children to school. Tr. at 10.
{¶ 7} On cross-examination, Sharon DeCarlo admitted that neither she nor her husband notified police of either incident and that appellee had never done anything to physically harm her. Tr. at 16.
{¶ 8} Robert DeCarlo not only confirmed his wife's version of the broomstick incident, but also described an incident in the spring of 2000 when appellee followed him as he was driving his children to school.
 {¶ 9} I'm driving around aimlessly. This man's following me. * * * I was finally getting tired of this. I stopped in front of the Midas Muffler Shop and I wanted [sic] for what seemed like an eternity but was probably more like two minutes. Then I got out of the van. And, I had a big flashlight with me. And, as I approached his vehicle, he pulled up right behind me, I mean, close behind me.
 {¶ 10} As I approached his vehicle, he closed his window. I stood there and I stared at him. He stood there staring at me, grinning and then he stuck his middle finger up at me and just sat there grinning.
 {¶ 11} I tapped my flashlight to his window and I told him to leave us alone. I walked back and stood outside my van door and after a few minutes, he finally left.
{¶ 12} Tr. at 26-28.
{¶ 13} Mr. DeCarlo described another incident when appellee was parked outside his children's school and, as DeCarlo was letting them out of the car, appellee slowly drove by staring at her and her children. Tr. at 29. Another incident involved appellee walking
 {¶ 14} towards us on the other side of the street which made all of us very uncomfortable * * *.
{¶ 15} * * *
 {¶ 16} He was sitting on the guardrail and he said, specifically, that everyone around here likes you. Your time's coming. I'm going to get you I'm going to kill you.
{¶ 17} Tr. at 30-31.
{¶ 18} Mr. DeCarlo went on to describe other instances of harassment by appellee. He follows me when I'm walking my dog whether it's on foot of [sic] in his vehicle. If he's outside, he makes a point of walking to the front of my house to stare at me, my kids, my wife, our guests. Tr. at 31-32. Mr. DeCarlo stated that because of appellee's conduct he lets his children play only in the front yard with supervision. Tr. at 32. He also described an incident when he confronted appellee and verbally challenged him to a fight. Tr. at 38, 40, 51-52. Appellee has filed at least twenty reports with the city prosecutor's office. On cross-examination, appellant admitted that appellee has also called the police on him about twenty-five times.
{¶ 19} Frank Hanzel, who lives in a split-duplex on Aldeene, testified that appellee threatened him by saying, if I don't watch my mouth * * *, I will be shot. Hanzel then said, I confronted him back and said, `all I ask is for you to leave me and my family alone.' He said, your family will be shot also. Tr. at 61-62. Hanzel also described on-going hostility between him and appellee after a fence was erected between their two driveways. Tr. at 63, 73. Finally, Hanzel stated appellee concerns him because he's unstable, in my opinion. The man, he don't act normal. He does abnormal things night and day. It's a scary thing to me and to my family because don't [sic] know where he's coming from or what he's going to do. Tr. at 67.
{¶ 20} Elizabeth Benyi was appellants' next witness. Ms. Benyi testified that she moved from Aldeene Avenue,
 {¶ 21} [b]ecause this man, I get up early in the morning to go to work and I leave my dog out. So, as I was doing that there, he would be in his van.
{¶ 22} * * *
 {¶ 23} And, he'd be driving by our house very slow and turn off the headlights 4:30 in the morning. Now in the wintertime, I go out to my car, go back in the house. I'd have to go back outside not knowing who'd be out there waiting for me. Yes, I was scared.
 {¶ 24} I come home from work one evening, I was headed west coming down Aldeene. He was headed east. I started to proceed to back my car up into my yard. He stops his car and puts it in reverse trying to hit mine.
 {¶ 25} Another day, * * * [h]e pulled his van right across my driveway so I couldn't get into it. * * *
 {¶ 26} Every time we turned around, we had the police at our door for parking tickets, unnecessary stuff.
{¶ 27} Tr. at 78-79. Ms. Benyi stated she moved because appellee made her fear for her life. Tr. at 81.
{¶ 28} Detective Maurice Hamilton testified that he followed up on a menacing by stalking complaint filed by Mr. DeCarlo. During his investigation, Detective Hamilton stated that it was a difficult case to pursue criminally because at least three incidents are necessary to pursue prosecution and that it was still an on-going investigation because there was not enough evidence. Tr. at 87-89.
{¶ 29} Appellants' next witness, Preston Young, stated that when he visited the DeCarlos on four separate occasions, appellee was bizarre and just stared. Tr. at 95.
{¶ 30} Officer Raymond Francel testified that he rents from Robert DeCarlo and lives next door to him on Aldeene. Francel stated that appellee has called the police on him for having expired license tags, a claim which was not true. Francel testified that he, too, has seen appellee stand and stare and do other odd things like turning his van lights off at night while he drove slowly down the street. You can see him staring, trying to stare down the driveway, looking towards the house, looking towards the windows. Tr. at 101-102.
{¶ 31} Appellants' final witness was Sarah DeCarlo, age 11, who testified about the time appellee was parked in front of her school. [W]e saw him sitting in his van and then he grinned and went away. Tr. at 109. She stated, I feel scared. Tr. at 109.
{¶ 32} On cross, Sarah admitted, however, that appellee never threatened to hurt her. Tr. at 112.
{¶ 33} At the end of appellant's case, the defense orally moved for a directed verdict and/or to dismiss the complaint. At the end of a hearing on this motion, the court stated it was going to dismiss the petition.[1] Tr. at 116.
{¶ 34} Appellants present one assignment of error for review.
 {¶ 35} THE TRIAL COURT ERRED IN GRANTING APPELLEE'S MOTION FOR A DIRECTED VERDICT SINCE APPELLANTS INTRODUCED EVIDENCE THAT ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE THAT THE APPELLEE KNOWINGLY ENGAGED IN A PATTERN OF CONDUCT THAT CAUSED APPELLANTS AND THEIR FAMILY MEMBERS TO FEAR THAT APPELLEE WOULD CAUSE THEM PHYSICAL HARM.
{¶ 36} At the outset, we note that the court did not grant appellee's motion for a directed verdict. Rather, the journal entry reads, the petition for stalking * * * is denied. The Supreme Court of Ohio has previously ruled that if there is no jury, the proper motion is a dismissal under Civ.R. 41[B][2]. Felton v. Felton (1997),79 Ohio St.3d 34, 43, 679 N.E.2d 672. In the case at bar, the court's decision falls under Civ.R. 41(B)(2), which states:
 {¶ 37} After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52 if requested to do so by any party.
{¶ 38} Under Civ.R. 41(B)(2), the trial judge, as the trier of fact, determines whether the plaintiff has proven the necessary facts under a preponderance of the evidence standard. Felton, supra; See, L.W. Shoemaker, M.D., Inc. v. Connor (1992), 81 Ohio App.3d 748, 612 N.E.2d 369; Central Motors v. Pepper Pike (1979), 63 Ohio App.2d 34, 409 N.E.2d 258. Even if the plaintiff has presented a prima facie case, dismissal is still appropriate where the trial court determines that the necessary quantum of proof makes it clear that plaintiff will not prevail. Central Motors, at 49. In the case at bar, the trial court erred in denying the petition for a protection order.
{¶ 39} As this court noted in Shutway v. Shutway (Feb. 10, 2000), Cuyahoga App. No. 76737, 2000 Ohio App. LEXIS 461 on appellate review, when the trial court's determination rests upon findings of fact, those findings will not be overturned unless they are against the manifest weight of the evidence. Shutway, at *9 citing C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. An appellate court will not reverse the decision of a trial court for being against the manifest weight of the evidence if the decision of the trial court is supported by competent, credible evidence. Shutway at *9; Felton, supra.
{¶ 40} R.C. 2903.214 allows for the issuance of protection orders for victims of menacing by stalking. Pursuant to R.C. 2903.211, appellants have the burden to show by a preponderance of the evidence that appellee's pattern of behavior was violative of the statute, by a pattern of conduct, because he knowingly caused them to believe that [he] will cause physical harm or mental distress to them. Huffer v. Chafin (Jan. 28, 2002), Licking App. No. 01-CA74, 2002 Ohio App. LEXIS 257, citing Lindsay v. Jackson (Sept. 8, 2000), Hamilton App. No. C-990786, 2000 Ohio App. LEXIS 4043, applying Felton, supra.
{¶ 41} The stalking statute specifies that a pattern of conduct means two or more actions or incidents closely related in time. R.C.2903.211(C)(1). It also defines mental distress as any mental illness or condition that involves some temporary substantial incapacity or mental illness or condition that would normally require psychiatric treatment. R.C. 2903.211(C)(2).
{¶ 42} A reviewing court will not reverse a trial court's judgment so long as it is supported by competent and credible evidence going to all the elements of the case. Huffer at *5, citing Masitto v. Masitto (1986), 22 Ohio St.3d 63, 488 N.E.2d 857.
{¶ 43} As noted in Lindsay, supra:
 {¶ 44} [T]he statute contains two independent prongs. It requires proof that the offender knowingly caused mental distress to another or that the offender knowingly caused another to believe that the offender would cause physical harm to another person.
{¶ 45} Lindsay at *13.
{¶ 46} Before turning to the facts in the case at bar, we note the remedial goal of the statute. As noted by the court in Lindsay, civil protection orders are an important part of the overall legislative scheme that is designed to allow the police and courts to act before a victim is harmed by a stalker. (Emphasis added.) Lindsay at *5.
{¶ 47} In the case at bar, we concur with the trial court's determination that none of the appellants sufficiently demonstrated mental distress of the degree required by statute. On the other hand, under the alternative and second prong of the statute, we disagree with the court's conclusion that appellants failed to show, by a preponderance, that appellee's pattern of conduct caused them to believe he would cause physical harm to one or all of them. City of Dayton v. Davis (1999), 136 Ohio App.3d 26, 735 N.E.2d 939; State v. Skeens (Dec. 3, 1999), Montgomery App. No. 17528.
{¶ 48} At the hearing, both Robert and Sharon DeCarlo described the incident when appellee, without sufficient provocation, grabbed a broomstick pole and began swinging it at Mr. DeCarlo within an inch and a half of his face. Sharon DeCarlo testified that appellee had followed her and her children in her car and once found him parked at the school. These incidents frightened her.
{¶ 49} Moreover, for apparently no reason, on one occasion appellee intentionally attempted to hit Benyi's car and pulled his van across her driveway to block her from pulling in. Officer Francel testified that he has seen appellee staring at houses while he was driving slowly down the street at night and in the early morning hours with his headlights turned off.
{¶ 50} Most persuasive is Robert DeCarlo and Frank Hanzel's testimony that appellee, on two different occasions, specifically threatened both of them. Robert DeCarlo described the incident when appellee said, [y]our time's coming. I'm going to get you I'm going to kill you. Hanzel recalled appellee's threat not only to shoot him, but his family as well.
{¶ 51} Given the remedial purpose of the statute, we find that appellee's pattern of conduct over a two-year period was not only continuous but certainly menacing. Because of his stated threats and his menacing behavior, appellants showed, by a preponderance of the evidence, that appellee knowingly caused appellants to believe he would cause them and their families physical harm. We conclude that the decision of the trial court is against the manifest weight of the evidence; on the record before us, we find that the appellants showed by a preponderance of the evidence that appellee had engaged in a pattern of conduct constituting menacing by stalking. The trial court thus erred by not granting appellants' petition for a protection order.
Appellants' assignment of error is well taken. The judgment of the trial court is reversed and this matter remanded for further proceedings consistent with this opinion.
This cause is reversed and remanded.
It is, therefore, ordered that appellants recover of appellee their costs herein taxed.
It is ordered that a special mandate be sent to said court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES J. SWEENEY, P.J. AND COLLEEN CONWAY COONEY, J., CONCUR.
[1] The court's journal entry, however, differs slightly from its statement on the record. The docketed journal entry reads:
 BASED UPON THE EVIDENCE PRESENTED AT THE FULL HEARING BEFORE THIS COURT ON AUGUST 2, 2001 AND AUGUST 3, 2001, THIS COURT FINDS THAT THE [SIC] PETITIONER'S HAVE FAILED TO PROVE A VIOLATION OF THE MENACING BY STALKING LAW PURSUANT TO R.C. SECTION 2903.211. THE PETITION FOR STALKING CIVIL PROTECTION ORDER FILED 7/18/01 IS DENIED. FINAL. VOL. 2629 PG. 0235 NOTICE ISSUED.