MASITTO, APPELLEE, *v.* MASITTO [NOSE ET AL., GUARDIANS], APPELLANT.

[Cite as Masitto *v.* Masitto (1986), 22 Ohio St. 3d 63.]

(No. 85-241—Decided February 5, 1986.)

*McCarter & Weaver* and *William K. McCarter,* for appellee.

*Phillip A. Lawrence & Associates, Phillip A. Lawrence* and *Loren Loving Vail,* for appellant.

*Per Curiam.* The sole issue before this court is whether it is contrary to law for a trial court to proceed under the "best interest of the child" test enunciated in R.C. 3109.04 when the parent requesting a change in custody has previously consented to the appointment of the child's grandparents as her guardians. The appellate court determined that the "suitability" test enunciated in *In re Perales* (1977), 52 Ohio St. 2d 89 [6 O.O.3d 293], was the proper standard which the trial court must apply in an R.C. 2151.23(A)(2) proceeding. For the following reasons, we must reverse the appellate court and uphold the trial court's decision.

The general rule in Ohio regarding original custody awards in disputes between a parent and a non-parent is that "parents who are 'suitable' persons have a 'paramount' right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children." *In re Perales, supra,* at 97. (Footnote omitted.) However, once an original custody award has been made, the general rule is that such award will not be modified unless "necessary to serve the best interest of the child." R.C. 3109.04(B). We must determine the effect of a parent consenting both to his child's status as a ward and to a divorce decree which, in essence, incorporated the guardianship appointment, on the trial court's choice of the proper test: parent's suitability versus child's best interest.

Under the law pronounced in *Perales, supra,* if a parent contracts away custody rights of his minor child, he may be considered to have forfeited his right to custody of such child, and may accordingly be found to be unsuitable for custody. Parents may undoubtedly waive their right to custody of their children and are bound by an agreement to do so. *Rowe v. Rowe* (App. 1950), 58 Ohio Law Abs. 497, 499 [44 O.O. 224]. The parents' agreement that custody of their child should be given to a third person is enforceable "subject only to judicial determination that the custodian was in every way a proper person to have the care, training and education of

the child. * * *" *Id.*, citing *Clark* v. *Bayer* (1877), 32 Ohio St. 299, paragraph two of the syllabus. Such a determination of the grandparents' fitness for custody was made by the trial court here, and will be upheld if the father did indeed relinquish his right to custody.

Whether or not a parent relinquishes rights to custody is a question of fact which, once determined, will be upheld on appeal if there is some reliable, credible evidence to support the finding. See *C. E. Morris Co.* v. *Foley Constr. Co.* (1978), 54 Ohio St. 2d 279 [8 O.O.3d 261]. The trial court made such a determination here, and we consider the evidence of the father's agreement signed February 8, 1978, and his conduct, taken as a whole, as reliable, credible evidence in support thereof. Not only did the father here specifically consent to having his child be under the care of the grandparents from September 1976 until the present custody dispute, but he also consented in the agreement to their being appointed her legal guardians, and later consented to a divorce decree which in essence incorporated his agreement to have Stacy under the care of the Noses. We must agree with one court's reasoning that "[w]here a person accepts the custody of a child by virtue of an agreement with the parents of the child, the contract may be such, and the care and support may be furnished for such a length of time and under such circumstances as to estop the parents from denying that they have relinquished or forfeited their natural right to the custody of the child." *Garcia* v. *Cardarelli* (App. 1929), 7 Ohio Law Abs. 262, 263. See, also, *In re Tilton* (1954), 161 Ohio St. 571 [53 O.O. 427], paragraph three of the syllabus (minor mother who surrenders child to blood relatives, and takes no step to disaffirm such agreement for over four years after reaching majority, may be found by the court to have affirmed the agreement).

The appellate court reasoned that this father did not totally relinquish his custodial rights, and could thereby still be considered "suitable," because he paid support and exercised his visitation rights. Paying support and exercising visitation rights (granted as a matter of course to noncustodial parents in divorce decrees) are not determinative of relinquishment of custodial rights. Under all the facts here, we hold that by consenting to the guardianship and divorce decree, the father forfeited his natural rights to custody of his daughter, making the child's best interest the appropriate test for a change in custody.

An additional factor to consider here is that the guardianship status of the minor child could not have existed unless the probate court found that the "parents are unsuitable persons to have the custody and tuition of such minor, or whose interests, in the opinion of the court, will be promoted thereby." R.C. 2111.06. This statute also provides that the guardian "shall have the custody and provide for the maintenance [and education] of the ward * * *." Therefore, the guardianship statute seemingly provides that the original custody award and any modification thereof would have to proceed under the "best interest of the child" test man-

dated by R.C. 3109.04(B). Since the trial court proceeded under that section, and the factors enumerated thereby, *i.e.*, integration of the child into custodian's family, detriment of change not outweighed, etc., we uphold the trial court's actions.[3]

It is our conclusion, upon a review of all the facts and circumstances here, that Louis Masitto's consent to the guardianship appointment, and to the divorce decree essentially incorporating such, estops him from claiming he did not relinquish his natural rights to custody. All of such acts and circumstances reasonably serve as an original award of custody to the guardian, modification of which requires satisfaction of the child's best interest. Since the child's best interest has been found to be preserved by the Noses' retaining custody, there is no question of fact remaining to be determined on which to order a remand.

Therefore, the judgment of the court of appeals is reversed, and the judgment of the trial court is reinstated.

*Judgment reversed.*

SWEENEY, LOCHER, HOLMES and WRIGHT, JJ., concur.

CELEBREZZE, C.J., and C. BROWN, J., dissent with opinion.

DOUGLAS, J., dissents.

CELEBREZZE, C.J., dissenting.  For almost five years Stacy Masitto has been trapped in the middle of a pitched battle for her custody. The record makes it abundantly clear that some of the adults in this matter have relegated her to the role of pawn in a vindictive game. The legal and emotional ordeal of this child is reminiscent of that undergone by the pitiful wards of the English chancery courts protrayed in Charles Dickens' novel, Bleak House.

The difficulty of this unfortunate saga is now compounded by the majority's approval of the lower courts' fundamental error in jurisdiction. Based on the following, I believe it was reversible error for the domestic relations court to have assumed jurisdiction in the dispute over custody of this child.

---

[3] Although the probate court may have exclusive jurisdiction to appoint and remove guardians under R.C. 2101.24(D) and *In re Clendenning* (1945), 145 Ohio St. 82 [30 O.O. 301], paragraph one of the syllabus, the common pleas court, division of domestic relations, is given general jurisdiction of all domestic matters by R.C. 3105.011. Since appellee's motion before the domestic court was for change of custody, such court had general subject matter jurisdiction, and thus had authority to determine its own jurisdiction when that issue was raised below. *State, ex rel. Smith,* v. *Court* (1982), 70 Ohio St. 2d 213 [24 O.O.3d 320]. Since neither party appealed the domestic court's finding that it had jurisdiction, and since this action is not one for removal of guardian, any error as to jurisdiction has been waived under R.C. 2505.21.

On April 7, 1978, the Probate Court of Lake County appointed Frank and Anna Nose as guardians of Stacy Masitto.[4] This appointment was made pursuant to the probate court's exclusive and plenary jurisdiction to appoint and remove guardians. See R.C. 2101.24(D). Pursuant to R.C. 2111.06, a guardian of the person has the *custody* of the ward and must provide for the ward's maintenance and education.

The courts of Ohio have long and unanimously held that exclusive, original jurisdiction in the matter of appointment and removal of guardians is in the probate court. *In re Clendenning* (1945), 145 Ohio St. 82 [30 O.O. 301], paragraph one of the syllabus. See, also, *Shroyer* v. *Richmond* (1866), 16 Ohio St. 455, paragraph four of the syllabus; *Hoffman* v. *Fleming* (1902), 66 Ohio St. 143, 156; *Union Savings Bank & Trust Co.* v. *Western Union Tel. Co.* (1908), 79 Ohio St. 89, 99; *In re Fore* (1958), 168 Ohio St. 363, 372 [7 O.O.2d 127]; *Weigel* v. *Grossnickle* (1954), 100 Ohio App. 106, 107-108 [60 O.O. 66]; *In re Guardianship of Reynolds* (1957), 106 Ohio App. 488, 490 [7 O.O.2d 222]. The exercise of jurisdiction by the probate court "binds all the world" and its order appointing a guardian *cannot be collaterally attacked. Clendenning, supra,* at paragraphs two and three of the syllabus. This court also stated in *Clendenning,* at 92, that "[a] ward receives such status [being subject to the continuing, exclusive jurisdiction of the court] from a proceeding *in rem* in the Probate Court * * *. The *control of the ward's person* and property *remains in the Probate Court* with the discharge of the duties in respect thereof being delegated to a guardian as the agent of the court and subject to the orders of the court." (Emphasis added.)

In the instant case, it is apparent that any custody award of Stacy

---

[4] The guardianship agreement signed February 8, 1978 reads as follows and contains a visitation schedule:

"AGREEMENT

"The Parties to this Agreement are LOUIS MASITTO, Party of the First Part, and FRANK NOSE, JR., and ANNA M. NOSE, Husband and Wife, Parties of the Second Part.

"WHEREAS the parties of the second part are the maternal grandparents of STACY CHRISTINE MASITTO, age 3 (born 11/3/73), and WHEREAS the parties of the second part have made Application for Appointment as Guardians of Stacy Christine Masitto in the Probate Court of Lake County, Ohio, and WHEREAS the party of the first part has consented to the Appointment of the parties of the second part being appointed guardians of the said child,

"IT IS THEREFORE AGREED by and between the parties hereto that the party of the first part shall be permitted to have visitation with Stacy Christine Masitto one evening per week until 7:30 p.m. or later if arrangements are made, and the visitation shall at times be away from the Nose residence, and one day each weekend until 9:00 p.m. Times and days may be substituted to fit work and social schedules. Beginning about April 1, 1978, Louis Masitto shall be given the right to have his daughter overnight for vacation and some Holiday periods."

The visitation schedule in the above agreement was basically incorporated into the divorce decree of January 22, 1980. The domestic relations court did not, however, make an original award of legal custody.

Masitto by the domestic relations court could have affected the guardianship by changing custody of the ward, Stacy, from the guardians to appellee, Louis Masitto. However, the guardianship of Stacy's person ordered by the probate court could not have been terminated in this manner by the domestic relations court because the latter had no jurisdiction to do so. Appellee's motion for change of custody was actually an impermissible collateral attack on the probate court's order of guardianship.

In essence, there was no subject matter jurisdiction over Stacy's custody in the domestic relations court. The probate court's jurisdiction over her guardianship was original, exclusive and continuing. Today's result could conceivably lead to situations in which a guardian could obtain custody of a minor ward by an order of the probate court, but a rival party could later obtain custody of the same child by an order of the domestic relations court. One can only imagine the spectacle of such bitter foes as we have before us now waving their respective court orders at each other. In this case, the tug of war involving Stacy would have been devastating and certainly not in her best interest. Such a situation is exactly what statutes defining jurisdiction are attempting to avoid.

Thus, the probate court was the only court which had continuous subject matter jurisdiction over Stacy's custody. The proceedings in domestic relations court were a nullity. The correct procedure for appellee to have followed in order to seek custody of his daughter was, and still is, to file a motion in the probate court to terminate the guardianship of the Noses[5] pursuant to R.C. 2111.46.[6]

Under this statute, the probate court may remove a guardian "for good cause." The probate court is the appropriate forum for appellee to present his contention that the Noses' contemptuous and defiant denial of

---

[5] Appellee filed a motion for a change of custody in the Lake County Domestic Relations Court on February 3, 1981. That court then assumed jurisdiction. On May 4, 1981, appellant, through her guardians, the Noses, filed a motion to dismiss appellee's motion on grounds of lack of subject matter jurisdiction. The motion to dismiss was erroneously denied by the domestic relations court on June 30, 1981. In its judgment entry dismissing appellant's motion, the trial court stated that both parties had long since invoked the court's jurisdiction and that such jurisdiction was concurrent with the probate court's.

This determination was in error. As stated in this dissent, consent to the jurisdiction of the domestic relations court is irrelevant where the exclusive, original subject matter jurisdiction over this guardianship rests with the probate court.

Appellee belatedly filed a motion to terminate the guardianship in the Lake County Probate Court in 1982, but that court continued the matter pending the outcome of the custody dispute in the domestic relations court. However, the probate court should have immediately exercised its exclusive, continuing existing jurisdiction over the custody of its ward.

[6] R.C. 2111.46 reads, in pertinent part:

"When a guardian has been appointed for a minor before such minor is over fourteen years of age, such guardian's power shall continue until the ward arrives at the age of majority, unless removed for good cause or unless such ward selects another suitable guardian. * * *"

the visitation rights contained in the guardianship agreement is good cause for the removal of these guardians.[7] Indeed, Mrs. Nose seemingly considers herself above the law with respect to visitation orders and, in her zealous attempt to "punish" appellee, she has sought to poison the relationship between Stacy and her father.[8] Undoubtedly, this has already had a deleterious effect on the child, and the continuation of a guardianship which has wrought such turmoil for the ward may not be in Stacy's best interest.[9] These are some of the factors exclusively for consideration by the probate court, in its jurisdiction over the custody and control of the ward's person. *Clendenning, supra,* at 92.

For the foregoing reasons, I conclude that the majority decision affirming the order of the domestic relations court retaining custody in the guardians is based on an appeal not properly before this court. The proceedings in the domestic relations court were a nullity for lack of subject matter jurisdiction. Accordingly, I dissent.

C. BROWN, J., concurs in the foregoing dissenting opinion.

---

[7] On November 5, 1981, the trial judge of the domestic relations court found the Noses in contempt for their refusal to comply with court-ordered visitation rights. The judgment entry reads in part as follows:

"Upon motion in contempt brought by plaintiff-father, Louis Masitto, the Court finds that the child has been prevented from visiting with the father on an overnight basis because of Mr. and Mrs. Nose's deliberate, adamant, unjustified, defiant and unreasonable refusal to allow same. * * *"

Furthermore, in the Findings of Fact and Conclusions of Law accompanying the "award" of custody to the Noses, the trial court stated in part:

"19. The grandmother believes she has complete, irrevocable, absolute, uncontrolled, and almost unlimited power to do anything she alone thinks is in the best interest of the child because she apparently thinks the Court's [sic] through guardianship and custody orders have given her perpetual control not even subject to any further Court action."

[8] In its judgment entry of November 5, 1981 finding the Noses in contempt, the domestic relations court stated in part:

"* * * The Noses appear to be consumed with hatred toward the father and seem to blame him in some way for the brain damage suffered by the mother during the birth of Stacy. They have seized upon this single issue of overnight visitation as the symbol of their superior power and control over his child and are using it to endlessly punish the father, regardless of the damage being wrought to the child Stacy."

[9] In its Findings of Fact and Conclusions of Law accompanying the "award" of custody to the Noses, the domestic relations court found in part:

"16. It is clear that this child is caught in the middle of a struggle. * * * This situation as it has been going forth over the past years is one which is continuing to cause negative effects upon the growth, development, attitudes and behavior of this child.

"* * *

"22. The conduct of the maternal grandparents has had a dilatorious [sic] effect on the child's relationship with her father.

"23. The conduct on the part of the maternal grandparents tends to poison the child's mind against the parent.

"24. The conduct of the maternal grandmother on the witness stand in open Court causes concern for the emotional and mental health present in the child's environment.