**In re JAMES.**

[Cite as *In re James,* 163 Ohio App.3d 442, 2005-Ohio-4847.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–040533.

Decided Sept. 16, 2005.

444

Katz, Greenberger & Norton, L.L.P., and Ross M. Evans, for appellees.

Stephen King Jr., and King & Myfelt, L.L.C., for appellants.

---

MARK P. PAINTER, Judge.

{¶ 1} This case involves a child-custody dispute between parents and grandparents. Both parties seek custody of Brayden James, who was born on April 2, 1999. The appellees are Brayden's parents, Damon and Jamie James, and the appellants are Jamie's parents, Rick and Cynthia Hutchinson. We affirm the trial court's decision to transfer custody of Brayden from his grandparents to his parents. We also hold that R.C. 3109.04(E)(1)(a) is unconstitutional as applied to the situation here.

## I. Legal Custody to Grandparents

{¶ 2} In December 1999, when Brayden was eight months old, Damon was charged with domestic violence for an incident with Jamie. An examination of Brayden revealed a rib fracture and several healing bruises. The Hamilton County Department of Job and Family Services filed a complaint alleging that Brayden was neglected, abused, and dependent. The Hutchinsons were immediately given temporary custody of Brayden.

{¶ 3} In June 2000, Brayden was adjudicated abused and dependent. The Jameses were given a reunification plan. In May 2001, needing more time to improve their circumstances, the Jameses agreed to a grant of legal custody of Brayden to the Hutchinsons. From then until February 2004, Damon and Jamie attended many counseling sessions and completed various parenting programs. They also had supervised visitation with Brayden. In addition, the Jameses paid child support to the Hutchinsons.

{¶ 4} In February 2004, the Jameses asked the court to restore custody of Brayden to them. The trial court heard testimony from all the parties and from three professionals who had worked with the parties and Brayden. The court

indicated that it favored returning custody of Brayden to his parents, but held off on making a final determination to allow an independent custody investigator to review the case and to observe Brayden interacting in a home situation with each of the parties.

{¶ 5} Several months later, after the custody investigator's report recommended that Brayden be returned to his parents' custody, the trial court granted custody to the Jameses and visitation rights to the Hutchinsons. The Hutchinsons now appeal with four assignments of error.

## II. No Need to Find Changed Circumstances

{¶ 6} In their first assignment of error, the Hutchinsons claim that for the court to have even considered the Jameses' motion for custody, it had to have first made a determination that a "change of circumstances" for Brayden or the Hutchinsons had occurred. They base their argument on R.C. 3109.04(E)(1)(a), which states, "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child."

{¶ 7} While the statute supports the Hutchinsons' argument, the case law indicates that we must hold, in this case, that the statute is unconstitutional.

{¶ 8} In *Moorman v. Moorman,* this court held that in a custody dispute between a parent and a nonparental custodian, the sole issue for the trial court to determine was the child's best interest.[1] In *Moorman,* the child was placed with a nonparental custodian after his parents divorced. Neither parent was found unfit or unsuitable, but it was considered to be in the child's best interest at the time of the divorce to be placed with the nonparent. The mother later sought to regain custody, offering proof that her own circumstances relative to her ability to rear her child had improved and stabilized and that it would be in the child's best interest to be raised by her.

{¶ 9} We considered a statute that was essentially the same as the current R.C. 3109.04(E)(1)(a). The former statute required that before a court could modify a decree, the court had to find that a change of circumstances for the child or the custodian had occurred.

---

1. *Moorman v. Moorman* (May 16, 1979), 1st Dist. No. C–780227.

{¶ 10} We held that the statute was unconstitutional. This was because parents might be able to establish that their circumstances had changed and that custody with them would be in the child's best interest, yet they still would be precluded from regaining custody unless they could also prove that the circumstances of the nonparental custodian or the child had changed. We held that a parent has a fundamental and constitutionally cognizable interest in the custody of his or her child and that a failure to recognize that interest violated a parent's right to due process.[2] We concluded that any change of circumstances for the child or the custodian should be considered as merely one factor among others in determining the best interest of the child.[3]

{¶ 11} Since *Moorman,* the Ohio Supreme Court has approved of the necessity for a finding of a change of circumstances under R.C. 3109.04(E)(1)(a) in situations where a parent has given *permanent* custody of a child to a nonparent.[4] But as several Ohio appellate courts have held, "[I]f parents have surrendered only temporary custody of a child to non-parents, they retain a paramount right to the custody of the child and need not overcome the heavy burden of R.C. 3109.04(E)(1)(a) in order to regain custody."[5]

{¶ 12} The appellate courts have held that when a parent agrees to surrender temporary custody to a nonparent, "it is not a relinquishment of a parent's right to preferential treatment in a subsequent determination of custody. * * * [W]hen only temporary custody has been awarded to a non-parent, a parent typically must establish nothing more than current suitability to be a parent."[6]

■ {¶ 13} The appellate decisions are based on the Ohio Supreme Court's holdings in *Masitto v. Masitto* and *In re Perales* that parents who are deemed suitable have a paramount right to the custody of their minor children as against nonparents.[7]

---

**2.** Id.

**3.** Id.

**4.** *Masitto v. Masitto* (1986), 22 Ohio St.3d 63, 22 OBR 81, 488 N.E.2d 857.

**5.** *In re Mears* (June 21, 1996), 2nd Dist. No. 95 CA 116, 1996 WL 338673; see, also, *Gorslene v. Huck* (Oct. 24, 2001), 5th Dist. No. 01CA40, 2001 WL 1326877; *In re Joles* (June 30, 2000), 11th Dist. No. 99–L–087, 2000 WL 895586; *In re Spriggs* (Apr. 24, 1990), 4th Dist. No. 89–CA–1803, 1990 WL 54871.

**6.** *In re Godsey*, 2nd Dist. No. 2002–CA–69, 2003-Ohio-2692, 2003 WL 21213377; see, also, *In re Borders* (Dec. 30, 1999), 2nd Dist. No. 99 CA 9, 1999 WL 1267742.

**7.** *Masitto*, supra, 22 Ohio St.3d at 65, 22 OBR 81, 488 N.E.2d 857; *In re Perales* (1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047.

{¶ 14} In *In re Hockstok*, the Ohio Supreme Court recently ruled on a custody dispute between grandparents and a mother.[8] The court discussed *Masitto v. Masitto*,[9] in which the court determined that a father, though never found unsuitable, had nonetheless lost his "paramount" right to custody of his minor child by agreeing to a *permanent* grant of custody to the child's grandparents.[10] The *Hockstok* court emphasized that a permanent forfeiture of the father's custody rights made him unsuitable as a parent.

{¶ 15} The court then further addressed the important distinction between permanent custody and legal custody. It determined that a grant of legal custody, as opposed to permanent custody, did not necessarily mean that the parents were found unsuitable.[11]

{¶ 16} "Permanent custody" is defined in R.C. 2151.011(B)(30) as "a legal status that vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, including the right to consent to adoption, and *divests the natural parents or adoptive parents of all parental rights, privileges, and obligations, including all residual rights and obligations.*" (Emphasis added.)

{¶ 17} The court contrasted the definition of permanent custody with that of legal custody. "Unlike most areas of the law where permanency of final orders is a paramount principle, in child custody law, flexibility is often an overriding concern. Such flexibility is codified in R.C. 2151.011(B)(19), which defines the term 'legal custody' as 'a legal status that vests in the custodian the right to have physical care and control of the child * * * *subject to any residual parental rights, privileges, and responsibilities.*' (Emphasis added.) This definition of legal custody is statutory codification of the principle that in child custody, permanency of final orders is not always of the highest priority. * * * [The] grant of mere legal custody [to the grandparents] means that [the mother] was never divested of her fundamental parental rights, and she can therefore petition the courts for a custody modification at any time." [12]

{¶ 18} By emphasizing that legal custody is a nonpermanent, or temporary, acquiescence of parental rights, the court concluded that "after the legal custody

---

8. *In re Hockstok*, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971.

9. *Masitto*, supra.

10. *Hockstok*, supra, at ¶ 22.

11. Id. at ¶ 36.

12. Id. at ¶ 35–36.

determination is made, the best-interest-of-the-child standard should be used for any custody modification petitions filed by a natural parent."[13]

{¶ 19} Therefore, we hold that when a nonparent has nonpermanent custody of a child, the requirement in R.C. 3109.04(E)(1)(a) that the child's parent must demonstrate a change in circumstances for either the child or the nonparent in order for the court to modify custody is unconstitutional. As we stated in *Moorman*, a parent has a fundamental and constitutionally cognizable interest in the custody of his or her child, and a failure to recognize that interest violates a parent's rights under the Due Process Clause of the Fourteenth Amendment. Because parents have a paramount right to raise their own child, when a parent petitions for custody of his or her child from a nonparent, a court must consider only what is in the best interest of the child.

{¶ 20} Under the facts of the present case, it is undisputed that the Hutchinsons had only legal custody of Brayden. The magistrate's order stated, "Based upon the agreement of the parties and in the best interest of the child, temporary custody to HCJFS is terminated [and] legal custody of Brayden James is awarded to Cynthia and Rick Hutchinson (maternal grandparents)."

{¶ 21} After the grant of legal custody, the court granted the Jameses supervised visits with Brayden and also ordered both Jamie and Damon to pay child support to the Hutchinsons. The regular visitation and mandatory child support also indicated that the Hutchinsons' custody of Brayden was only temporary.

{¶ 22} In addition, in their testimony, both Rick and Cynthia Hutchinson stated repeatedly that they did not view their custody of Brayden as permanent.

{¶ 23} In her testimony, Cynthia Hutchinson was asked, "You see Brayden as your own child, don't you?" She replied, "Absolutely not." Counsel continued, "You're sure of that?" and she responded, "I'm positive." Counsel then asked, "It wouldn't be your desire to adopt Brayden and cut off his contact with his parents?" She answered, "No, it would not."

{¶ 24} Both Rick and Cynthia were later asked by the court when, if ever, they would think Brayden should be restored to Jamie's and Damon's custody. Both responded that it could be appropriate when Brayden was older and when he would be believed if he said that somebody had hurt him. Both guessed that the appropriate age could be around 10 or 12 years old.

{¶ 25} Clearly, if the Hutchinsons themselves did not consider that they had permanent custody of Brayden, or even advocate for it, we can only conclude that

---

13. Id. at ¶ 38.

the grant of legal custody to the Hutchinsons was temporary in nature and never completely severed the Jameses' residual parental rights.

{¶ 26} Because the Jameses never lost their paramount right to custody of their son, the trial court correctly ruled on their motion to regain custody based on what was in Brayden's best interest. There was no need for the trial court to determine whether there had been a change in circumstances for Brayden or the Hutchinsons. Once the court determined that the Jameses were suitable parents and that it was in Brayden's best interest to be with his parents, the Jameses were entitled to custody of Brayden.

{¶ 27} Therefore, we overrule the Hutchinsons' first assignment of error.

### III. No Need for a Guardian ad Litem

{¶ 28} In their second assignment of error, the Hutchinsons argue that the trial court erred when it denied their motion asking the court to appoint a guardian ad litem ("GAL") to represent Brayden.

{¶ 29} In custody matters, a court may appoint a GAL for a child.[14] Whether to do so is within the court's discretion.[15]

{¶ 30} In this case, the trial court held a full hearing on the motion for custody. In addition to the testimony of all four parties and Damon's father, the court heard testimony from several professionals. Dr. David Samuel Marcus, a child and family psychologist who had counseled Damon and Jamie, testified. Dr. Leslie Swift, another clinical psychologist who had worked with each of the couples, separately and together, testified. And also testifying was Katherine Merriles, a clinical social worker and Brayden's therapist, who had seen Brayden on a weekly basis since he was 11 months old.

{¶ 31} During the hearing, the Hutchinsons moved for the court to order a parenting investigation "for the purpose of evaluating and reporting to the Court the factors, circumstances and expert opinions regarding the best interest of the minor child." The Hutchinsons also requested in their motion that the independent custody investigator be Dr. Swift.

{¶ 32} At the conclusion of the witnesses' testimony, both parties rested their cases and delivered closing arguments. After a brief recess, the trial court issued a ruling from the bench. The court granted the Hutchinsons' motion in part. The court stated that it was appointing an independent custody investigator, but that it would choose the evaluator, rather than using Dr. Swift. The

---

14. R.C. 3109.04(B)(2)(a).

15. Id.

court noted that it did not want to use an evaluator from the Department of Jobs and Family Services, because of the department's initial involvement in the case.

{¶ 33} The court instead appointed Jane Chapman, a custody investigator with the domestic relations court. Chapman was instructed to do a home evaluation of Brayden with his grandparents and then also with his parents. While Chapman prepared her report, the court ordered expanded visitation time for the Jameses with Brayden.

{¶ 34} Several months later, Chapman submitted a report to the court recommending that the Jameses be given custody of Brayden. At that point, the Hutchinsons moved for the appointment of a guardian ad litem for Brayden.

{¶ 35} In support of their motion, the Hutchinsons argued that Chapman's report did not address comments made by Brayden's school teachers. Specifically, Brayden apparently had told his teachers that he had to keep secrets and that he was going to get hit by his father.

{¶ 36} The court denied the Hutchinsons' motion for a GAL. The court stated, "This custody investigator did everything a guardian ad litem would be expected to do and then some. She's a neutral, detached officer of another court, well experienced. Her report was very comprehensive."

{¶ 37} The Hutchinsons then cross-examined Chapman about why she did not include in her report all of Brayden's comments to his teachers.

{¶ 38} Chapman testified that she was aware of Brayden's comments. She testified, "I chose not to include it because I think that Brayden has a lot of pressure on him in regards to the difficulties between his grandparents and parents. And I believe part of that is what he does tell people and what he knows they want to hear. * * *And I believe that, yes, that Brayden interpreted the teachers as being sort of in his grandparents' camp if you will." Chapman continued, "I think [Brayden] understands that his grandparents don't trust his father and I think he feels some need to perhaps make comments like that about his dad. But he did not appear that way in person."

{¶ 39} Chapman observed Brayden in his parents' home and stated, "I didn't see any fear, any distrust, any negative reaction to his father. He seemed very comfortable." Chapman testified that she did not include all of Brayden's comments "[b]ecause I felt that Brayden was saying those things in support of his grandparents basically and I don't know if I believe that."

■ {¶ 40} We conclude that the trial court did not abuse its discretion when it decided not to appoint a GAL at the late stage in the proceedings. The trial court's decision was supported by the existence of many evaluations and investigations that had already been conducted in the case. And as the trial court

stated, Chapman, the final independent custody investigator, "operates almost as a guardian ad litem would operate. She's a neutral investigator, not even employed by this court, whose sole job is to determine what would be in the best interest for the child."

{¶ 41} Therefore, we overrule the Hutchinsons' second assignment of error.

### IV. The Trial Court Did Not Manipulate the Custody Investigation

{¶ 42} In their third assignment of error, the Hutchinsons assert that the trial court manipulated the custody investigation to serve the court's own goal of reunification.

{¶ 43} In a vein similar to their second assignment of error, the Hutchinsons argue that the trial court should have appointed Dr. Swift to be the independent custody investigator. They also contend that the court should not have appointed an investigator from the domestic relations court.

{¶ 44} As we have already addressed, the trial court indicated its intention to have an independent custody investigator, that is, a new investigator who had not previously worked on the case, observe Brayden in each of the home environments and make a recommendation to the court of what would be in Brayden's best interest. Dr. Swift had worked previously with both of the parties and had already testified before the court. He therefore was not a good candidate to formulate an independent or fresh opinion on the situation.

{¶ 45} Accordingly, the trial court deliberately appointed a custody investigator who was not familiar with the parties or the case in any way to help the court determine what would be in Brayden's best interest at that time. In the final hearing, Chapman, the domestic relations custody investigator appointed by the court, testified that she had worked in the domestic relations court for 14 years and had worked on cases in which children had had no contact or only supervised visitation with their parents.

{¶ 46} We conclude that the court's decision to appoint a truly independent custody investigator was not only within its discretion, but appropriate under the circumstances.

{¶ 47} Not content to merely disagree with the trial court's appointment of Chapman as the independent custody investigator, the Hutchinsons further claim that the trial court's appointment was an attempt to manipulate the investigation to favor the Jameses. The Hutchinsons allege that the trial court met with Chapman prior to the custody investigation and, without the presence of or notice to counsel for either party, gave her unknown instructions regarding the investigation.

{¶ 48} The record does not support these rather intemperate allegations.

{¶ 49} When Chapman was appointed, the court stated that it had spoken to a judge of the domestic relations court for a recommendation of a custody investigator and noted that it was not personally familiar with Chapman. The court then stated, "Barring something coming in from that custody evaluation it is my intention to remand custody [to the Jameses] effective August 1st. I am not foreclosed to the idea that something could come in from that custody evaluation that may change my mind. There may be issues that I have not considered. The custody evaluator may find a whole new issue that none of us even considered. So this—that part of the decision is not cut in stone. That could change."

{¶ 50} During Chapman's testimony at the final hearing, the Hutchinsons' counsel asked Chapman who had assigned the case to her. After an objection, counsel restated the question: "Typically how are you assigned parents' investigations? How do you learn of them?" After another objection, the court stated, "I'm a little more concerned that the question is hinting at some irregularity. Exactly what do you want to know? I think I can answer your question." The court continued, "I contacted Judge Panioto [a domestic relations judge]. Judge Panioto actually sent up two custody investigators."

{¶ 51} The Hutchinsons' counsel then asked Chapman, "Have you had any conversations with any court staff or personnel above and beyond a normal custody investigation in this matter?" The Jameses' counsel objected, and the court stated, "No. I want that question answered." The Hutchinsons' counsel clarified the question: "Have you met with any judges in this matter other than an initial meeting or how you were initially assigned the case?" Chapman answered, "I had a conversation with judge—my supervisor and [the trial court judge]. That is it."

{¶ 52} Counsel stated, "I think that answers my question." The court interjected, "Wait a minute. I want Ms. Chapman to answer when that conversation took place." The court asked Chapman whether the conversation had taken place before or after she began her investigation. Chapman answered that her conversation with the trial court was before she had begun her investigation and that the court had not talked to her since that time.

{¶ 53} The court then addressed the Hutchinsons' counsel, "Go ahead, Mr. King. And let me warn you. You are on thin ice. If you have an allegation to make, make it on the record and I will respond to it on the record." Counsel responded, "I think at this point we're not making any allegation, your Honor."

{¶ 54} There is nothing in the record to support the Hutchinsons' allegation that the trial court's meeting with Chapman before her investigation was for any

reason but to simply assign the case to her. Though counsel attempted to elicit testimony that supported a theory of the trial court's bias, counsel was unable to unearth any irregularities.

{¶ 55} Despite this, counsel for the Hutchinsons continue to assert in their brief before this court that the trial court had inappropriate discussions with Chapman and demonstrated bias against the Hutchinsons. In support of the allegations, the Hutchinsons and their counsel cite the trial court's threat of sanctions in the case.

{¶ 56} But threatening or imposing sanctions was within the power of the trial court under appropriate circumstances. The record reveals that the trial court was concerned that the parties, particularly the Hutchinsons, would attempt to lengthen the litigation to avoid implementing the trial court's decision to return custody to the Jameses.

{¶ 57} At the hearing in which the Jameses received custody, the court stated, "I'm not going to grant sanctions today. But I'll tell you what. They're coming in the future if this litigation continues to operate against the best interest of the child."

{¶ 58} The court later lamented how long the litigation had taken and the extreme acrimony between the parties. It stated, "The custody investigation that came up—I can't express to you how unremarkable the custody investigation was to me, because it simply reiterated what we have all seen play out in this courtroom over the last two years. * * * [I]f this litigation continues there are going to be sanctions. If I find that motions are filed frivolously or that contempt motions are filed frivolously or that either party no matter what order we make violates that order there's going to be big sanctions, huge sanctions."

{¶ 59} A trial court is allowed to sanction parties—a threat of sanctions is not proof of impropriety by the trial court. We conclude that the Hutchinsons' counsel's assertions of manipulation by the trial court are completely unsupported by the record.

{¶ 60} It was at the Hutchinsons' own request that the trial court ordered an additional investigation before the final hearing. And the Hutchinsons had no objection to Chapman's appointment until after her report had recommended that the Jameses be given custody of Brayden. Faced with the inevitable return of Brayden to his parents, the Hutchinsons and their counsel have resorted to desperate, and inappropriate, tactics. We understand that emotions run high, but emotions must be tamed before a court of law.

{¶ 61} There is no basis for the Hutchinsons' third assignment of error, and we overrule it.

## V. Brayden's Best Interest

{¶ 62} In their fourth and final assignment of error, the Hutchinsons argue that the trial court erred when it found that a return to the Jameses' custody was in Brayden's best interest.

{¶ 63} As a reviewing court, we must be deferential to the trial court's determination of custody. "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." [16]

{¶ 64} The Ohio Supreme Court has articulated a standard of review for custody cases: "Where an award of custody is supported by a substantial amount of credible and competent evidence, such an award will not be reversed as being against the weight of the evidence by a reviewing court." [17]

{¶ 65} While it is difficult to summarize the facts revealed by the extensive testimony at trial, a thorough review of the record assures us that the trial court had substantial competent and credible evidence to determine that it was in Brayden's best interest to be returned to his parents' custody.

{¶ 66} Damon and Jamie James are Brayden's natural parents. Since the time that the Hutchinsons initially took custody of Brayden, both Damon and Jamie have made extensive efforts to improve their relationship and their situation. Through all their difficulties, they have remained married. Damon has completed several parenting programs and has volunteered to take more. Damon has undergone individual counseling, and Damon and Jamie together have participated in over 23 sessions with a parenting specialist. In the fall of 2003, the Jameses had another son, Zander, a full brother to Brayden. At the time of the trial court's ruling, they had cared for Zander without incident. Damon and Jamie have also purchased a home and demonstrated that they have the financial ability to care for Brayden.

{¶ 67} Much credit should be given to the Hutchinsons for their willingness to step in at a time of crisis and to care for Brayden. By all accounts, they have

---

16. *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846.

17. *Bechtol v. Bechtol* (1990), 49 Ohio St.3d 21, 550 N.E.2d 178, syllabus.

loved and nurtured him. We hope that they will always maintain an important role in Brayden's life.

{¶ 68} But, unfortunately, the record reveals that the Hutchinsons simply cannot believe that Damon is capable of being a good father to Brayden, and they cannot trust the judgment of their own daughter to make good decisions for her children. Despite all the hoops Damon and Jamie have jumped through and their demonstrations that they have matured and are prepared to be suitable parents, the Hutchinsons insist that Brayden is somehow in danger when he is with Damon and Jamie. But the Hutchinsons' fears are not supported by the record.

{¶ 69} We conclude that substantial competent and credible evidence supported the trial court's decision to return custody of Brayden to the Jameses. It is time for Brayden to be returned to his family—his parents and his brother.

{¶ 70} Therefore, we overrule the Hutchinsons' fourth assignment of error and affirm the trial court's judgment.

Judgment affirmed.

HILDEBRANDT, P.J., and GORMAN, J., concur.