DECISION AND JUDGMENT ENTRY
{¶ 1} Sonya D. Coe ("Mother") appeals the judgment of the Washington County Court of Common Pleas, Juvenile Division, granting custody of the parties' minor child, Chance B. Coe (DOB: December 30, 1997), to Todd Schneider ("Father"). Mother contends that the trial court erred in finding that a change in circumstances occurred, and in finding that it was in the child's best interest to modify custody. Because some competent, credible evidence in the record supports the trial court's finding that a change of circumstances occurred, and that it was in the child's best interest to grant custody to Father, we disagree. Accordingly, we overrule Mother's assignments of error and affirm the trial court's judgment.
 I. {¶ 2} On August 20, 2002, the Washington County Child Support Enforcement Agency filed a complaint to establish paternity of Chance B. Coe. After the Washington County Court of Common Pleas, Juvenile Division, issued an order establishing paternity, Father filed a complaint for custody. After conducting a hearing on the matter, the trial court issued a decision and entry on July 24, 2003, designating Mother as Chance's residential parent and legal custodian.
 {¶ 3} On July 20, 2004, Father filed a motion for an emergency temporary order designating him as Chance's residential parent and legal custodian, alleging that Chance's continued residence with Mother presented a significant and immediate danger to the child, and that Mother absconded with the child without providing Father with information regarding the child's whereabouts. Father also filed a motion for modification of parental rights and responsibilities, alleging that a substantial change of circumstances occurred, and that Mother's home presented a significant danger to Chance's health and wellbeing.
 {¶ 4} In his affidavit in support of the motions, Father alleged that: (1) the police had been called to Mother's home numerous times for various altercations at the home; (2) Mother's neighbors reported observing mother smoking marijuana in front of the child; (3) Mother's neighbors reported observing Mother intoxicated on a regular basis while the child was in her care; (4) Mother cut short Father's visitation with the child and disappeared with him, leaving her apartment empty; (5) Father believed Mother fled to Florida with the child and Buddy Miller; (6) there had been several incidence of violence between Mother and Buddy Miller; (7) Father believed that Chance was in substantial danger and an immediate order was necessary to protect Chance from Mother. Accordingly, Father requested that the court issue an emergency order designating him as Chance's temporary residential parent and legal custodian, as well as an order designating him as Chance's permanent residential parent and legal custodian.
 {¶ 5} The next day, the trial court issued an emergency order designating Father as Chance's temporary residential parent and legal custodian and ordering Mother, or any other person in possession and control of the child, to immediately surrender him to Father. Thereafter, Mother and Chance were located in Florida, and with the aid of local police, Father obtained physical custody of Chance.
 {¶ 6} In March 2005, the trial court conducted a hearing upon Father's motion for modification of parental rights and responsibilities. At that hearing, the court heard testimony from Officers Owen Surrey and Brian Huffman; Brian Ketelsen, Mother's former probation officer; Lisa Ball and Yvonne Dement, employees of Washington County Children Services; Sandra Beals and Loretta Farnsworth, Mother's former neighbors; Father; Mother; Christine Coe, Chance's maternal grandmother; Laura Ledger, Mother's friend; and Shannon Hines, Mother's son and Chance's half-brother. Additionally, upon Mother's request, the court conducted an in camera interview with Chance regarding the allocation of parental rights and responsibilities.
 {¶ 7} On March 22, 2005, the trial court issued a decision and judgment entry. In its decision, the court noted that it based its prior custody decision upon its findings that Mother had quit drinking and using drugs. Since that time, the court found that the police had responded to Mother's residences numerous times to investigate reports of domestic violence, disturbances involving alcohol, and fighting. During those calls, the court noted that Mother was usually intoxicated and combative toward the officers. Based upon the testimony of Mother's neighbors and Chance's report during the court's in camera interview, the court found that Mother was frequently intoxicated and fought with her boyfriends in the child's presence. The court also noted that Chance liked living with his father and stepmother because they do not fight.
 {¶ 8} Additionally, the court found that Mother took Chance and moved to Florida without providing any notice to Father. At the time of the decision, Mother continued to reside in Bradenton, Florida with her boyfriend — the same boyfriend who was involved in disturbances that required police intervention at Mother's Marietta home. The court noted that Mother's boyfriend had ten arrests for alcohol related offenses, three for drug violations, and two for offenses of violence. The court also noted Mother's pending theft and contempt charges in Marietta.
 {¶ 9} The court found that since Father had obtained temporary custody, Chance had been integrated into Father's home. Chance was happy, well adjusted, and had friends, both at school and in his neighborhood. Chance was also seeing a counselor who helped reduce his aggressive behavior at school. The court also found that Mother did not exercise any visitation with Chance after Father obtained temporary custody, although she did speak with him via telephone. She also failed to send him any birthday or Christmas presents.
 {¶ 10} Based upon the foregoing, the trial court found that a change of circumstances occurred and that a custody modification was in the best interest of the child. The court also concluded that the benefits of the safe and nurturing environment in Father's home greatly outweighed any harm that might be caused by the change of custody. Accordingly, the trial court designated Father as Chance's residential parent and legal custodian.
 {¶ 11} Mother now appeals raising the following assignments of error: "[I.] The trial court erred by finding that a change of circumstances had occurred. [II.] The trial court erred by finding that it is in the best interests of the child to change residential parents."
 II. {¶ 12} In her first assignment of error, Mother contends that there was insufficient evidence to support the trial court's finding that a change of circumstances occurred. Specifically, Mother contends that the testimony presented at trial was not specific enough to support the trial court's findings that she was intoxicated in Chance's presence, or that Chance was present during numerous incidents of violence in her home.
 {¶ 13} A trial court enjoys broad discretion in custody proceedings. Davis v. Flickinger (1997), 77 Ohio St.3d 415, paragraph one of the syllabus. We will not disturb the trial court's decision regarding a motion for modification of custody unless the trial court abused that discretion. Miller v. Miller
(1988), 37 Ohio St.3d 71, 74. An "abuse of discretion" connotes that the court's attitude is "unreasonable, arbitrary, or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219; Booth v. Booth (1989), 44 Ohio St.3d 142, 144.
 {¶ 14} While the trial court has discretion to grant or deny a change of custody, the record must contain sufficient factual evidence to support the court's findings regarding the change in circumstances, the child's best interests, and the determination that the harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child. Beekman v. Beekman (1994), 96 Ohio App.3d 783, 787. We will not reverse a judgment as being against the manifest weight of the evidence when the record contains some competent, credible evidence going to all the essential elements of the case. C.E.Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, syllabus. In conducting our review, we must make every reasonable presumption in favor of the trial court's findings of fact.Myers v. Garson (1993), 66 Ohio St.3d 610, 614; Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80. We give deference to the trial court as the trier of fact because it is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. at 80.
 {¶ 15} R.C. 3109.04(E)(1)(a) provides in relevant part: "The court shall not modify a prior decree allocating parental rights and responsibilities for the care of children unless it finds, based on facts that have arisen since the prior decree or that were unknown to the court at the time of the prior decree, that a change has occurred in the circumstances of the child, the child's residential parent, or either of the parents subject to a shared parenting decree, and that the modification is necessary to serve the best interest of the child. In applying these standards, the court shall retain the residential parent designated by the prior decree or the prior shared parenting decree, unless a modification is in the best interest of the child and one of the following applies: * * * (iii) The harm likely to be caused by a change of environment is outweighed by the advantages of the change of environment to the child."
 {¶ 16} Under R.C. 3109.04(E)(1)(a), our threshold inquiry is whether a change of circumstances occurred since the prior decree that would warrant a change of custody. Here, Mother claims that the testimony presented at the hearing does not support the trial court's finding that Chance was present during incidents of violence in Mother's home, or that Chance observed her while she was intoxicated. Specifically, Mother contends that the testimony presented was too vague to support the trial court's findings. We disagree.
 {¶ 17} Officer Huffman testified that he responded to a disturbance at Mother's home on July 1, 2003, wherein Brian Babcock assaulted Mother. He stated that after he transported Babcock to the police department, he returned to Mother's home to interview her. There, he stated that Mother appeared to be intoxicated, and that she admitted consuming six beers. Although he did not see Chance, he testified that Mother indicated he was in the back bedroom. Officer Huffman did not testify that Chance witnessed his Mother's intoxication or the altercation that occurred in the home.
 {¶ 18} Officer Surrey testified regarding an altercation that occurred at Mother's home just three weeks later. Mother notes that Officer Surrey did not see Chance in the trailer when he responded to the July 24, 2003 call, and that he testified that a neighbor claimed to have removed Chance from the trailer before or during the altercation between Brian Babcock and John Luke. However, we note that Mother testified that the incident began with Babcock bursting into her home and attacking Luke while Chance slept on the couch. Therefore, based upon Mother's own testimony, the court could reasonably infer that Chance was present for at least a portion of the attack that, by Mother's own admission, left Luke so severely beaten he was life-flighted to the hospital.
 {¶ 19} Mother also takes issue with Officer Surrey's testimony regarding the smell of alcohol at her home that evening. Officer Surrey testified that he smelled alcohol when he entered Mother's home that night, and that he believed she had been drinking. However, Mother argues that the court could not infer, based upon that testimony, that she smelled of alcohol. But, Officer Surrey also testified that when he returned to the home later that night, he smelled a moderate amount of alcohol on Mother's breath, and that Mother was very combative toward him. These facts combined, support a reasonable inference that Mother was intoxicated.
 {¶ 20} Officer Surrey also testified that he had responded to Mother's home on other calls regarding fighting between Mother and Miller. When he arrived at Mother's home, she was generally combative and would not let the officers in the home so that they could ascertain what had happened. While Officer Surrey did not testify that Mother was intoxicated during those encounters, he did testify that he had dealt with Miller quite a few times, and that he was always intoxicated.
 {¶ 21} Although the officers did not testify that Chance was present during their numerous calls at Mother's home, Shannon Hines, Chance's older half-brother testified that Chance was present two or three times when the police responded to the house. Moreover, the trial court indicates that Chance reported that his Mother drank a lot and would fight with her boyfriends. Thus, the child's own report to the court demonstrates that he witnessed Mother's drinking and arguments with her boyfriends — arguments that, on at least seven occasions, led to the police responding to the home.
 {¶ 22} Mother contends that the record contains no evidence to demonstrate that Chance reported anything to the trial court. However, the record does reflect that the trial court conducted an in camera interview with the child pursuant to the Mother's request. App.R. 9(B) provides: "If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the weight of the evidence, he shall include in the record a transcript of all evidence relevant to such findings or conclusion." Alternatively, if a transcript is not available, an appellant may provide either a narrative statement of the proceedings pursuant to App.R. 9(C), or an agreed statement pursuant to App.R. 9(D).
 {¶ 23} As the appellant, Mother had the duty to provide the transcript, or other acceptable statement of the proceedings below, for our review. Rhoads v. Rhoads (Aug. 24, 1998), Highland App. No. 97CA944, citing Columbus v. Hodge (1987),37 Ohio App.3d 68 and Bates Springer, Inc. v. Stallworth (1978),56 Ohio App.2d 223. Yet, the record before us does not contain a transcript of the court's in camera interview with Chance. In the absence of a complete record, we must presume the validity of the trial court's findings. Ostrander v. Parker-Fallis Insulation
(1972), 29 Ohio St.2d 72, 74.
 {¶ 24} In addition to testimony of the officers' and Chance's own report to the court, two of Mother's neighbors testified that Mother was frequently very intoxicated. Sandra Beals testified that, on one occasion, there was something about Mother's eyes that indicated she was intoxicated. Ms. Beals struggled for words to describe what she saw in Mother's eyes, but the only description she could come up with was that they were evil. Ms. Beals also testified that Mother's memory failed her when she was intoxicated. She cited one specific incident when Mother asked her to pick Chance up and keep him at her house after school. Then, after school, Mother beat angrily on Ms. Beals door looking for Chance. When Ms. Beals reminded her that she had asked her to get Chance from school and keep him at her house, Mother denied making such a request and abruptly left with Chance.
 {¶ 25} Additionally, Ms. Beals testified that she saw Mother walking the streets at all hours of the night. She believed that Mother was intoxicated based upon her observation that Mother could not walk straight. Ms. Beals also testified that she could hear Mother and Miller fighting from outside Mother's house, and that the police were at the house a lot. Ms. Beals reported that when Chance would come to her house, he was really quiet and distant, almost like he was afraid to talk to her.
 {¶ 26} Another neighbor, Loretta Farnsworth, testified that she saw Mother carrying a twenty-four pack of beer up the street on two separate occasions. She also stated that she heard Mother and Miller fight at least every week and a half to two weeks during the five months that Mother lived next door to her. When they were fighting in Mother's home, it was loud enough that she could hear it in her home.
 {¶ 27} Father testified that on two separate occasions, he went to pick Chance up from Mother's home at her request. He stated that he went to get Chance with a police escort because Mother indicated that she and Miller were fighting and she feared for Chance's safety. On one of those occasions, Father testified that Mother was intoxicated and slurring her words when he arrived to remove Chance from Mother's care.
 {¶ 28} Although many of the witnesses spoke in terms such as usually, generally, and frequently, while testifying about their interactions with Mother, we note that each witness also testified in some detail about one or two specific encounters with Mother. Based upon the foregoing, we conclude that some competent credible evidence in the record supports the trial court's findings that Chance was present during incidents of violence in his Mother's home, and that he witnessed his Mother's intoxication. While Chance may not always have been in the room where the altercations took place, testimony places him in the home on at least two, and possibly three, occasions when the police intervened. Because testimony demonstrates the altercations could be heard from inside the neighbor's home, the trial court could reasonably infer that Chance could hear the altercation from a bedroom in Mother's home. Additionally, given the fact that the altercations often required police intervention, the trial court could reasonably have concluded that Chance was in some danger just being in the home.
 {¶ 29} Moreover, Chance's own report to the trial court and his demeanor, as reported by Mother's neighbor, support the trial court's finding that Chance was both aware of and negatively affected by the incidents in Mother's home. Therefore, we cannot find that the trial court abused its discretion in finding that the environment in Mother's home was not safe and nurturing, and, therefore, a change of circumstances warranting a change of custody occurred. Accordingly, we overrule Mother's first assignment of error.
 III. {¶ 30} In her second assignment of error, Mother contends that the trial court erred in finding that a custody modification was in Chance's best interest.
 {¶ 31} R.C. 3109.04(F)(1) enumerates the factors that a court must consider in determining a child's best interest in the context of a custody proceeding. It provides that: "In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to: (a) The wishes of the child's parents regarding the child's care; (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court; (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest; (d) The child's adjustment to the child's home, school, and community; (e) The mental and physical health of all persons involved in the situation; (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights; (g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor; (h) Whether either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25
of the Revised Code involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child; (i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court; (j) Whether either parent has established a residence, or is planning to establish a residence, outside this state."
 {¶ 32} While R.C. 3109.04(F) enumerates the factors that a court must consider in determining the child's best interest, the statute plainly indicates that it is not an exhaustive list. Therefore, a court may consider any other factors that it deems relevant. Mother contends that the trial court fails to indicate that it considered any of the relevant factors other than Chance's adjustment to his home, school, and community, and her relocation to Florida. Although the statute requires the court to consider the listed factors in determining the best interest of the child, "it is not necessary for the court to set forth its analysis as to each factor in its judgment entry, so long as the judgment entry is supported by some competent, credible evidence." Bunten v. Bunten (1998), 126 Ohio App.3d 443, 447, citing Masitto v. Masitto (1986), 22 Ohio St.3d 63. See, also,Vujovic v. Vujovic, Medina App. No. 04CA0083-M, 2005-Ohio-3942, at ¶ 60.
 {¶ 33} Here, Mother argues that the court should have considered the fact that she consistently allowed Father to exercise visitation with Chance, and that she intended to continue such visitation after she moved to Florida. In contrast, she alleged that Father denied her visitation during the Christmas holiday in 2004. However, it is unclear from Father's testimony exactly who requested Christmas visitation with Chance. Father began by testifying that Chance's maternal grandmother asked to take Chance to a family reunion. Father then indicated that "she" said she would like to see Chance for Christmas, and that she would give him custody if he would let Chance and Shannon fly to Florida for Christmas. Father testified that he would not permit the proposed Christmas visitation to occur in Florida because he still did not have a current address or telephone number for Mother. He expressed his concern that he would have no way of knowing where Chance would be or what Mother would do.
 {¶ 34} We note that the temporary custody order did not grant Mother specific visitation rights and further specified that, until further order of the court, any visitation between Mother and Chance was to be supervised by a person agreeable to Father. Therefore, we cannot say that the trial court abused its discretion by declining to make a finding that one parent was more likely to facilitate visitation, as specified in R.C.3109.04(F)(1)(f). Nor can we say that the court abused its discretion in declining to find that this one incident, where Father purportedly refused out of state visitation, amounted to the "continuous and willful" denial of parenting time as specified in R.C. 3109.04(F)(1)(i). Furthermore, it appears that the court did consider Chance's close relationship with Mother's extended family, including his older brother, Shannon, in finding that an award of custody to Father was in Chance's best interest. The record reveals that Shannon lives with Chance's maternal grandmother in Barlow, Ohio. Therefore, from the record, it appears that Chance would have a greater opportunity to continue his relationship with both his half-brother and his maternal grandmother while living with Father.
 {¶ 35} Finally, Mother argues that the trial court should not have based its determination of Chance's best interest upon its finding that her home was not a safe and nurturing environment. She again contends that the record contains little evidence to support the trial court's findings that Chance has been exposed to violence and intoxication in her home. However, we have previously found that the record contains some competent, credible evidence that Chance was present during incidents of violence in his Mother's home, and that he witnessed his Mother's intoxication.
 {¶ 36} Even if we assumed, arguendo, that the arguments between Mother and Miller have not resulted in physical violence, Mother acknowledged that they have resulted in the police being called to her home. Mother did not dispute that Miller, her current live-in boyfriend, had ten arrests for alcohol related offenses, three for drug violations, and two for offenses of violence. Moreover, Mother acknowledged that Miller has been treated for alcoholism, yet she testified he continues to consume alcohol. Therefore, we cannot say that the trial court abused its discretion in considering the safety of the environment in which Chance would be living. Accordingly, we overrule Mother's second assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that costs herein be taxed to the appellant.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Washington County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as the date of this Entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Harsha, P.J. and McFarland, J.: Concur in Judgment and Opinion.