O’Connor, C.J.,
dissenting.
{¶ 25} Because the law governing this case is well settled and the majority establishes no new law or governing principle, I would dismiss this appeal as having been improvidently accepted.
{¶ 26} It is irrefutable that parents have fundamental constitutional rights free from government intervention in their decisions on the custody and caretaking of *425 their children. In re Hockstok, 98 Ohio St.3d 238, 2002-Ohio-7208, 781 N.E.2d 971, ¶ 16. It is also irrefutable that those rights are not absolute.
{¶ 27} A parent may contractually relinquish custody rights and fully or partially confer those rights on another person who is not a parent to the child. Masitto v. Masitto (1986), 22 Ohio St.3d 63, 66, 22 OBR 81, 488 N.E.2d 857; In re Perales (1977), 52 Ohio St.2d 89, 98, 6 O.O.3d 293, 369 N.E.2d 1047. Thus, although Ohio law will not recognize a biological parent’s intent to confer the status of “parent” on a same-sex partner, it will recognize a biological parent’s decision to voluntarily relinquish the right to sole custody of the children in favor of sharing custodial rights with that partner. In re Bonfield, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 47.
{¶ 28} For courts to enforce a parent’s decision to confer custody rights of a minor child on a same-sex partner or other person who is not within the legislative definition of a “parent” to the child, there must be a showing that the parent contractually agreed to share custody. Bonfield, 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, ¶ 48; Perales, 52 Ohio St.2d at 98, 6 O.O.3d 293, 369 N.E.2d 1047. The juvenile court’s decision will be upheld if there is some reliable, credible evidence to support that finding of an intention to share with another person the custody of a child. Masitto, 22 Ohio St.3d at 65, 22 OBR 81, 488 N.E.2d 857. Arguably, that evidence can take many forms, including the conduct of the parties before and after the child’s birth.
{¶ 29} Nothing in Bonfield or our prior decisions mandated that an agreement to relinquish sole custody be in writing. But as the facts of this case show, prudence now dictates that the agreement be documented.
{¶ 30} The American family takes many forms, including those in which children are raised lovingly in homes headed by two fathers or two mothers, or by grandparents and siblings, or by a single parent. Our evolving social and cultural notions of family and parenthood coincide with the advancement of reproductive science, medicine, and technology that now permits people to create families in ways quite different from the traditional paradigm in which children are born of one woman impregnated directly by one man. As our understandings of the family evolve, so do our understandings of parenthood. “Parenthood in our complex society comprises much more than biological ties, and litigants increasingly are asking courts to address issues that involve delicate balances between traditional expectations and current realities.” N.A.H. v. S.L.S. (Colo. 2000), 9 P.3d 354, 359. This is such a case.
{¶ 31} But the public policy inherent in the discussion of children in these families, including same-sex couples, is largely undefined in Ohio. The current statutory definition of “parent” is often unhelpful in custody determinations in families headed by same-sex couples.
*426 {¶ 32} To the degree that guidelines exist, they have been established, with some trepidation, by the courts. Thus, in Bonfield, this court declined to adopt the “psychological” or “second parent” tests described in V.C. v. M.J.B. (2000), 163 N.J. 200, 233, 748 A.2d 539, and In re Custody of H.S.H.-K. (1995), 193 Wis.2d 649, 658, 533 N.W.2d 419, because it is not the province of the judiciary to expand a statutory definition created by the General Assembly. Accord Smith v. Gordon (Del.2009), 968 A.2d 1, 14-15. Instead, we attempted to apply the extant legal standards to a same-sex couple and their children. In doing so, we were driven not by “judicial activism” but by the reality that children exist in an array of familial configurations and that decisions about the custody and care of those children must be made, even in the void of legislative guidance.
{¶ 33} Bonfield was announced almost ten years ago. Little legislative action has followed in its wake. Although Bonfield has proven to provide guidance when the parent appears in court with a nonparent and expresses a clear desire to share custody of the child with the nonparent, it is of limited value in cases like this one, in which the parties now dispute that shared custody was ever intended or granted. The well-being of the child while the custody dispute is litigated is of paramount concern not only to the child and her family, but also to the juvenile courts that must continue to struggle to apply existing statutory definitions of a “parent” to custody determinations in same-sex couples and other families. The stakes are too high to permit so much uncertainty.
{¶ 34} In the absence of a statutory framework, the sufficiency of the evidence to show voluntary relinquishment of a parent’s custodial rights is even more critical. Although not required, a written agreement will demonstrate the best evidence of the parent’s intention to share custody, particularly in cases, like this one, in which the evidence stands in near equipoise. It is the preferred method of demonstrating the knowing and intelligent surrender of the parent’s fundamental right, in whole or in part, and reinforces to both the parent and the proposed custodian the concomitant rights and responsibilities that are associated with custody of a child.
{¶ 35} When any parent, without benefit of marriage, voluntarily brings another adult into the life of his or her child with the intent to create shared custody, the parent must proceed not only with the desire to create the custodial relationship, but also with diligence required to protect the child. The duty to protect a child and prepare for the child’s care, both at present and in the future, is a solemn one that flows to all parents in all families. Under certain circumstances it also flows to the courts. As we held in Bonfield, and reiterate now, pursuant to R.C. 2151.23(A)(2), the juvenile courts have the jurisdiction and duty to determine custody claims of children who are not wards of a court. Bonfield, *427 97 Ohio St.3d 387, 2002-Ohio-6660, 780 N.E.2d 241, at ¶ 45, 50; Morris v. Hawk, 180 Ohio App.3d 837, 2009-Ohio-656, 907 N.E.2d 763, ¶ 22.
McGee Brown, J., concurs in the foregoing opinion.